## TILGHMAN *v.* FRAZER ET AL.

[No. 201, October Term, 1947.]

134

*Decided June 17, 1948.*

*Rehearing denied July 20, 1948.*

*Petition for Addition to Opinion granted October 6, 1948.*

*Supplemental Opinion filed October 6, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, GRASON, AND MARKELL, JJ.

*Harrison Tilghman* for the appellant.

*Amos W. W. Woodcock* for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

This case involves three estates, all unsettled, although the respective testators have long since died. The first two are those of Dr. Samuel A. Harrison, who died in 1890, and his widow, Mrs. Martha I. Harrison, who died in 1909. These estates are only incidentally involved. The main questions concern the estate of Mrs. Belle H. Tilghman, daughter of Dr. and Mrs. Harrison, and wife of Colonel Oswald Tilghman, who died on March 5, 1931. Both Dr. and Mrs. Harrison and Colonel and Mrs. Tilgh-

man resided in "Foxley Hall" in the town of Easton, and the disposition of this property is one of the questions involved in this case. Mrs. Tilghman left surviving her, her husband, Colonel Oswald Tilghman, who died in 1932, a son, Colonel Harrison Tilghman, appellant in this case, and a daughter, Mary Foxley Tilghman Frazer, who, with her husband, Dr. John Frazer and her three children, are the appellees. Colonel Harrison Tilghman and Dr. Frazer are the executors of Mrs. Belle H. Tilghman's estate, and each of them appears in this case, not only in his individual capacity, but also as an executor.

Many factors contributed to the delay in the settlement of all of these estates. They were handled entirely within the family, and like so many family matters, they were not handled with the care, particularity, and dispatch which is requisite to a proper settlement of the affairs of a decedent. After the death of Mrs. Belle H. Tilghman, difficulties and disagreements arose between the appellant on the one side and the appellees on the other. Each side accuses the other of being responsible for the delay. Each is in some measure correct. However, the matters in dispute have now been brought to a head and can be finally settled in the case before us.

Dr. Harrison bequeathed to the appellant a legacy of $1000 and to the appellee, Mrs. Frazer, a legacy of $500. The executrices, who were his widow and his two children, Mrs. Tilghman and Mrs. Noble, left the monies to pay these legacies in the hands of Mrs. Tilghman. They were never paid. The remainder of Dr. Harrison's estate was left one-third to his widow and one-third to each of his daughters. Mrs. Noble was to receive a house in Baltimore as part of her one-third, and Mrs. Tilghman was to receive as part of her one-third, the "Foxley Hall" property. This property she did receive at a valuation of $8000.

Mrs. Harrison left a legacy of $1250 to appellant and a similar legacy to Mrs. Frazer. Mrs. Harrison's executrices, were Mrs. Noble and Mrs. Tilghman. Certain notes for the face value of $2500 were allocated to the

payment of these two legacies, and were left in the hands of Mrs. Tilghman. The notes were paid to Mrs. Tilghman, but she never paid the legacies. As an illustration of the loose manner in which the estate was handled, it appears that Mrs. Noble was in need of some money, and she appropriated $1325 which belonged to the estate, and Mrs. Tilghman, to offset this, also took $1325. These two were only entitled to the use of the estate for life. Since the death of Mrs. Tilghman, these amounts have been replaced in Mrs. Harrison's estate, and no question arises concerning them in this case.

Mrs. Tilghman's will was proved in the Orphans Court of Talbot County and the two executors duly qualified. Her will was in her own handwriting, and was evidently prepared without benefit of legal advice. The chancellor numbered the paragraphs, although these numbers did not appear in the original will. For the sake of convenience we will adopt the same procedure. The will was executed on April 14, 1926, and the paragraphs, which are involved in this case are as follows:

"(3) I wish my dear son Harrison Tilghman to be paid $1000. left by his grandfather & $1250. left his grandmother out of my estate.

(4) My dear daughter Mary Foxley Tilghman Frazer to be paid $500—left by her grandfather & $1250 left by her grandmother out of my estate.

(11) I wish no sentiment in regard to Foxley Hall— If my children deem it best to keep it as a home, do so— If they think it best to sell it—to do so & to invest the money—adding to my estate.

(12) My estate I wish both real and personal to be equally divided between my two children—during their life time.

(13) If my son Harrison never marries—his share of my estate to go to my daughter Mary Foxley Frazer & her children—If he should marry and have heirs. His heirs not reaching the age of 21 years—without children reverts to Mary Foxley Frazer and her children.

(14) Should Mary Foxley Frazer and her heirs die before reaching the age of 21—without heirs, her share goes to Harrison Tilghman & his heirs.

(17) The furniture, pictures, portraits to be equally divided between them my children—It is my desire to be equally just to each of them, for they are most dear to me—

(20) To my dear husband Oswald Tilghman should he survive me—a life estate in all my property. At his death to be equally divided as I here before directed.

(22) I intended to direct & wish if possible my legacies to be paid out of my income—I therefore direct my executors to take two years to settle my small estate if necessary."

Difficulties arose between those interested in the estate, and after some discussions, the appellant filed certain claims against the estate in the Orphans Court. Claim No. 13 was for $1325, being one-half of $2650 diverted from the Martha I. Tilghman estate by Mrs. Tilghman and Mrs. Noble. This matter was afterwards settled, so that we are not further concerned with it. Claim No. 15 was for the $1000 legacy left the appellant by his grandfather, Dr. Harrison, with accrued interest at the rate of 6% from 13 months after the date of probate of Samuel Harrison's will, the total amount, $3378.34. Claim No. 16 was for the legacy of $1250 left appellant by his grandmother, Martha I. Harrison, with interest from 13 months after the date of probate of Martha I. Harrison's will, the total amount, $2753.95. Claim No. 17 was for advances made for the account of his mother during her last illness, amounting to $3495.08, and additional advances to the extent of $939.03, and outlays for the preservation and security of "Foxley Hall", of $1001.38. These claims were filed on October or November 4, 1932 and in February 1933. At first, Dr. Frazer requested the Orphans Court to have plenary proceedings with respect to these claims. Nothing developed from that request, and subsequently, a proceeding was filed in the Circuit Court for Talbot County by Mrs. Frazer and

Dr. Frazer, individually and as co-executors, and the three children of Dr. and Mrs. Frazer, all then being infants. That proceeding was known as Chancery No. 2077, and in it was sought a construction of the will of Mrs. Tilghman. The appellant filed his answer in that proceeding on September 11, 1934, and an amended answer on September 27, 1935, and the complainants filed a replication to the amended answer on January 31, 1936, but no further action was taken in that case. Finally, on November 7, 1938, the bill of complaint in the case before us, which was known as Chancery No. 2358, was filed, by the appellees against the appellant, asking the court to assume jurisdiction over the Belle H. Tilghman estate, in consolidation with Chancery No. 2077, and for further proceedings for the completion of the administration and distribution of the estate and construction of the will. In answer to an order to show cause, passed on this bill of complaint, or as it is called, appellees' petition, the appellant filed a lengthy answer, in which he consents to the assumption of jurisdiction by the court and reaffirms his claims. This answer was filed on December 20, 1938. In the amended answer in No. 2077, which had been filed on September 27, 1935, appellant had set up a contract, which he claims he had made with his mother, by the terms of which he was to get one-half of the estate, including "Foxley Hall" at a valuation of $8000. His sister was to get the other half. This was presented as an alternative to receiving interest on his unpaid legacies from his grandfather and his grandmother. The proceedings in No. 2077 are not before us in this record, but the chancellor consolidated that case with No. 2358, passed an order assuming jurisdiction of the administration, and referred the proceedings to the auditor to state audits in conformity with the respective contentions of the parties. That was not done, however, and nothing happened in the case until January 13, 1947, when appellant took steps to have the case heard. Hearings were had beginning on June 11, 1947, and the chancellor filed his opinion on September 20,

1947, and a supplementary memorandum on January 2, 1948, on which last mentioned date, the decree from which the appeal herein was taken, was entered.

The questions before us for decision are: (a) Did Mrs. Belle H. Tilghman agree with the appellant that in consideration of his giving her the amounts due him on the legacies left by his grandfather and grandmother, she would leave him one-half of her estate, including "Foxley Hall" at a valuation of $8000; and, if such an agreement was made, does it take precedence over the provisions of her will? (b) In case an enforceable contract, as outlined in (a) does not exist, is the appellant entitled to any interest on the two legacies left him by his grandfather and grandmother, respectively? (c) Is appellant entitled to interest on his claim for money advanced to his mother? (d) Is appellant entitled to interest on the advances made by appellant to the estate of his mother? (e) Is appellant entitled to the outlays which he may have made for the preservation and security of "Foxley Hall" after the death of his mother? (f) What is the proper construction of the will of Mrs. Belle H. Tilghman, with respect to the estate left the appellant and the appellees, Mary Foxley Tilghman and her children, two of whom are now over 21, and the third one will be 21 within a few months.

The chancellor determined that there was no sufficient evidence of the contract mentioned under (a), and declined to enforce any such agreement. As to (b), he held that the appellant had given to his mother both the principal and interest of the legacies which he was left by his grandparents, and that he was entitled only to the legacies left him in paragraph three of the will of his mother, without any interest. As to (c) and (d), the claims of appellant were allowed, but he was denied interest. No appeal was taken by the appellees from the allowance of these claims. As to (e), the chancellor declined to allow these claims as proper charges against the estate. His interpretation of the will will be discussed when we reach point (f) in this opinion.

(a) Appellant is embarrassed in his presentation of his claim of a contract made with his mother by the Evidence Act, Article 35, Section 3, which prohibits him from testifying as to any transaction had with, or agreement made by his mother. He has to rely on certain statements made in letters and papers found among her effects. One of these is a letter written to him by his mother on March 6, 1915, when he was a lieutenant in the Army in California. This was just before his sister's wedding, and in response to a letter from him. The part of the letter which is pertinent to the appellant's claim is as follows: "You thought I ought to give Mary what her Grandmother left her at this time— & I will spend that much on her wedding though I do not intend to speak of it in that way—*I want you to have this house at an estimate of $8,000—if that is satisfactory to you.* One would think I was going to die, but not so—but I want you & Mary to understand me. *You must share and share alike.* I love one as much as the other, but now that Mary will have such a good protector my heart goes out more & more to you dear Child" (Emphasis supplied). There is also a memorandum of her father's estate found among Mrs. Tilghman's papers which shows the division of the estate into three parts, giving the details of what composed the share of each one. Her own included a house at $8000. which refers to "Foxley Hall". On the back is a memorandum as follows: "1000 to Harrison, 500 to Mary Foxley. This was paid by sail of personal estate— I think—& paid to me which I owe my children." A similar memorandum in the handwriting of Mrs. Tilghman and found among her papers, shows her mother's estate, but not the division of it. This contains the following statement: "My sister and I spent belonging to the estate 2650 Children's legacy 2500". Another paper in the handwriting of Mrs. Tilghman and found among her papers, contains some notes about what happened to various investments. This contained the following statement: "The $1500 on the Hall place—

went towards the childrens legacy & the 1000 on property near Preston—making the $2500". On another memorandum, similarly made and found, there are two statements; one is as follows: "My sister & I—spent 2650 when there was urgent need for my sister on account of sickness & I took what she took." The other, in which she refers to her mother, is "She lent me 1500 on the Hall place which 1500 I took for the Children—$1000—which she sold the place near Preston—" In addition to these items, appellant refers to certain testimony given by his co-executor, Dr. Frazer. He was asked what Mrs. Tilghman had said to Mrs. Frazer on two visits shortly before her death. His answer was "That there were certain things she desired to have done. She made that statement to Mrs. Frazer at that time. Mr. Tilghman wanted Foxley Hall. Let him have it. Don't move anything away. I want him refunded for what he has done for me. That was 91 days before the death of this Testatrix. On the occasion of another visit on January 20th, 1931, 43 days before the death of Mrs. Oswald Tilghman, * * * Mrs. Frazer told me that she wanted to understand clearly just what her mother wanted done in behalf of Colonel Tilghman, that, irrespective of whether she personally liked it or not, she wanted to do it if it were her mother's wish. As I have indicated, she had a talk with Mrs. Oswald Tilghman on January 20, 1931, 43 days before Mrs. Tilghman's death, and asked her in regard to the various matters which Mrs. Tilghman, of which she had spoken before. Mrs. Tilghman's reply was, 'I have not the slightest recollection of it. What I want is my Will carried out.' "

In all of this, except the last statement made by Mrs. Tilghman to Mrs. Frazer, it is clearly indicated that at various times Mrs. Tilghman wished the appellant to have "Foxley Hall". It is also clear that she recognized that she had not paid either of the children their legacies, but there is nothing to show any agreement by her, that in consideration of appellant's giving up his

legacies, she would give him half of the estate, including "Foxley Hall" at a valuation of $8000. She does say, in those letters, and in her will, that she wants the children to share equally in everything, but in her will she effectually shows that she did not consider that there was any bargain about "Foxley Hall". By paragraph Eleven she speaks of the possible sale of this property, unless "my children deem it best to keep it as a home". This would certainly negative any idea that she thought she had agreed that the appellant should have it. Further, she leaves the appellant, by paragraph Three, the specific amounts which he was left by his grandfather and grandmother, (doing the same for his sister by paragraph Four) and this indicates that she did not consider that she had been given these amounts in exchange for one-half of her estate, including "Foxley Hall", as claimed by appellant. The will was made April 14, 1926, which is 11 years after the letter in which she suggests to the appellant that he is to have "Foxley Hall" at the estimate of $8000. The appellant has not, in our opinion, proved the existence of such a contract with his mother as he claims, and we agree with the conclusion of the chancellor on this point.

(b) The alternate claim of the appellant is for interest from one year after the respective deaths of his grandfather and grandmother on the two legacies which his mother used during her life time. The chancellor held that he had given these legacies to his mother, and, therefore, he was not entitled to them, but was entitled to the legacies which she left him in place of them by paragraph Three of her will. We are not able to agree with the reasoning of the chancellor that the appellant gave his mother the principal of these legacies. Mrs. Tilghman recognized in her memoranda and in her will, repeatedly, that she owed these unpaid legacies to her children. She does not recognize that she owed any interest on them, and it is not indicated anywhere that any claim was ever made on her in her

life time for any such interest, either to be paid then, or to be accumulated and paid at her death. The fact that for 40 years in one case, and for 32 years in another no interest was apparently suggested, or spoken of to her by her children, indicates that they were willing to let her have the use of the money, or the securities in which it was invested, and she constantly acknowledged that she would pay them the principal. Under these circumstances, we think there is a presumption that the interest was intended by the appellant to be a gift to his mother, or, at least, that he waived any claim to it. The case has some aspects which are similar to the case of *Hirst v. Hooper*, 186 Md. 18, 45 A. 2d 750, 752, although in that case, as the appellant pointed out, there was an agreement made between two children to "start from scratch" in support of their father, and no mention was then made of any unpaid interest. However, the opinion of Judge Henry, which we quoted and adopted, cited this as only one incident which led him to believe that there was a presumption of a gift, and we said, "On a question of gift *vel non* the inferences to be drawn from words or conduct may be different in cases of persons in intimate family relationships from those in other cases." It is inconceivable that in a family relationship between a mother and son, so close and affectionate as the relationship between the appellant and his mother appears to have been, the mother would not have given the son everything she thought he was entitled to, when she was directing the payment of these legacies out of her estate. The fact that she did not include any interest shows that she did not think any was due him, and she could have only thought that from his action and his conduct during all the years she had his legacies in her possession without protest. Our conclusion is that the appellant has waived any right to interest on these legacies during his mother's life, although we agree with him that what his mother intended to do by paragraph Three was to pay a debt. The debt she directs to be paid to him is all the debt

that her estate owes him, with respect to these legacies, and no interest should be allowed upon it. *Turk v. Grossman,* 179 Md. 229, 17 A. 2d 122.

(c) This claim amounts to $3495.08. It is for nurse hire, general household expenses, drug store bills, doctors' bills and cash advanced, and runs from November 6, 1929 to February 25, 1931. The appellees contended below, by virtue of a remark alleged to have been made by appellant to his sister, that these amounts were gifts. If such a remark was made, we agree with the court below that, under the circumstances, it should not be held as a waiver of what appears to have been a general outlay by a son for his mother in her last years. She had sufficient securities to have provided this money had they been sold, and the proceeds used. The fact that they were not, increased the net estate, and was of benefit to the appellees. It comes with rather poor grace from them, now, to suggest that all of these outlays were gifts. The mother herself recognized what her son was doing and said that she wished him repaid. He filed his claim on February 11, 1933. The items were furnished on February 27, 1934 in the account filed, and, therefore, for 14 years the appellant has been without his money. We do not think, however, he is entitled to interest under *Turk v. Grossman, supra.*

(d) The chancellor allowed the appellant advances to the estate as claimed by him amounting to $939.03. These were for such things as death notices, executors' bonds, funeral expenses, some open accounts, a small legacy and taxes on personalty. These were all proper claims against the estate, and could have waited until an order had been passed, and some securities had been sold. It is commendable in the appellant to have paid them to avoid any unpleasantness about them, but since it is not shown that his co-executor at any time refused to assist in getting an order to sell property to pay debts, if that was necessary, or, if the estate had income in hand, to direct the bills to be paid out of the estate funds, we do not think appellant is entitled to interest

on these amounts. The question was passed upon as far back as 1863 in the case of *Billingslea v. Henry*, 20 Md. 282, where the court said "An executor who voluntarily pays debts out of his own funds, cannot claim interest on amounts so paid, when he has assets in his hands at the time sufficient to pay them which he has not chosen to convert into money."

(e) The claim for the preservation and security of "Foxley Hall", as shown in the itemized account, is for carpenter's work, materials, fertilizing, tree conservation, taxes, repairs to brickwork, repairs to furniture. The appellant had the use of "Foxley Hall" at least part of the time since his mother's death and since his father's death, claimed that he should get it in the settlement of his mother's estate, and under any construction of his mother's will is entitled to one-half interest, at least, during his life time. The proper construction of the will will be discussed later, but the above represents his minimum interest in it, in any event. Under these circumstances, he was expending money for the preservation of property in which he had an interest. These expenditures are not proper allowances for payment out of his mother's estate, and we think the court correctly so ruled.

(f) It is of course elementary that in the construction of a will the object of the court is to determine the intention of the testator from the whole will, and then to apply that intention, unless some specific provision is made which contradicts it. It is also true that a will must be construed prospectively from the standpoint of the testator or testatrix at the time and under the circumstances when the will is made. It cannot be construed retrospectively in the light of conditions which may have arisen afterwards. If it could, many of the provisions in will which have been held void because they violated the rule against perpetuities, might have been held perfectly valid testamentary dispositions. The correct rule is stated in *Gambrill v. Gambrill*, 122 Md. 563 at page 569, 89 A. 1094, at page 1095, in the follow-

ing words: "In determining this question of remoteness, there is an invariable principle that regard is to be had to possible, and not merely to actual events. It is not determined by looking back on events which have occurred and seeing whether the estate has extended beyond the prescribed limit, but by looking forward from the time the limitation was made and seeing whether, according to its terms, there was then a possibility that it might so extend." This principle and these words were quoted and approved in the case of *Perkins v. Iglehart*, 183 Md. 520, 39 A. 2d 672.

The testatrix in the case before us made a will at a time when her only son, the appellant, was not married and her daughter was married and had three children living. The husband of the testatrix was also still living. She gave her husband a life estate in all her property by Section 20 and stated that at his death it was to be equally divided as she heretofore directed. By Section 12 she stated what she had frequently said before in the conversations and letters in the record, that she wished her estate, both real and personal, to be equally divided between her two children, adding, after a dash, "during their life time." It was contended before the chancellor by the appellees that these words gave the son and daughter life estates, followed by contingent cross-remainders contained in the succeeding paragraphs. The appellees have apparently now abandoned this contention, but there is much to be said for the theory that the children have only life estates. The chancellor, on the authority of *Devecmon v. Shaw* 70 Md. 219, 16 A. 645, and *Backus v. Presbyterian Ass'n*, 77 Md. 50, 25 A. 856, held that the children, under item 12, took a fee simple estate in the real estate, and an absolute estate in the personalty as tenants in common, and that the estates of both children were defeasible upon the happenings of the contingencies, designated in the two succeeding paragraphs of the will. In the two cases cited by the chancellor there were no words indicating that the original gifts were for life, but in

the earlier case of *Dickson v. Satterfield,* 53 Md. 317, certain real estate was devised to a cousin of the testatrix "during her life and, in case of her death without issue", there was a direction for a sale and the use of the proceeds for a purpose which was found to be void. The cousin, who was granted a life estate, died unmarried and without issue, and the question was, who then became entitled to the property. The court said that the inference was irresistible, that it was intended that if the cousin had issue, they should have and enjoy the property because it would be "in the language of Mr. Jarman, 'attributing the grossest absurdity to the testator,' to suppose she intended her missionary charity to fail because of the first object of her bounty having issue, unless she intended that issue should enjoy her bounty in preference to the charitable object to which she gave the property in the event of there being no such issue. *1 Jarman on Wills,* 431." In that case, which was decided under the law existing prior to the act of 1862, it was held that the cousin took a fee simple in the property because the words used were construed as meaning an indefinite failure of issue and, therefore, the devise over was void. We are not confronted with that situation in this case. See also *Heald v. Heald,* 56 Md. 300 at page 311, and *Nowland v. Welch,* 88 Md. 48, at pages 50, 51, 40 A. 875, at pages 876, 877, where similar inferences were made by the court in the disposition of property after life estates. While it may make little practical difference whether we hold, under this will, that the children each have life estates, and their children, by necessary implication, have absolute estates as to the personalty and fee simple estates as to the realty, subject to defeasance under the conditions set forth in paragraphs 13 and 14, or whether we hold, as did the chancellor, that the children themselves have absolute estates in the personalty and fee simple estates in the realty, subject to defeasance, we think the correct interpretation is that the children are given only life estates.

We agree with the conclusion of the chancellor, that the general intention of the testatrix was to treat her two children equally as far as possible, and with that conclusion in view, paragraphs 13 and 14 must be interpreted as meaning approximately the same thing. Her general intention also was that she desired her entire residuary estate to remain in her issue as far as possible. She did not, fortunately, tie it up beyond the limit permitted by the rule against perpetuities. While under some conditions there might have to be two periods of gestation allowed, this is not contrary to the rule. *Tiffany on Real Property*, 3rd Ed., Vol. 2, paragraph 399, page 163. There is, after the life estate of Colonel Oswald Tilghman, a life estate in one-half of the estate in Harrison, and a remainder to his children, with a cross-remainder, or limitation over, however, to Mary Foxley, in case Harrison dies without leaving issue, or in case his children do not reach the age of 21 and do not leave issue. At the termination of Mary Foxley's life estate in one-half of the estate, there is a remainder to her children. If Mary Foxley dies without leaving living issue or descendants, then her share goes to Harrison. We reach this conclusion because it seems to us a necessary implication, as in the quotation from Jarman in the case of *Dickson v. Satterfield, supra*, that Mrs. Tilghman could not have intended Harrison's share to go to Mary Foxley on his death if he had a child who was then, for instance, only one year of age, and who might not reach maturity for 20 years. If Harrison's share, under such circumstances, went to Mary Foxley, then his child would get nothing, which we consider would be an absurd construction of Mrs. Tilghman's will. On the other hand, we think the contingency upon which Mary Foxley's share goes to Harrison can be determined only when she dies. If she then has children of age or issue of children, the children have an absolute remainder, otherwise Harrison takes. On the conclusion reached by the chancellor, she could now dispose of her one-half to strangers, and Harrison and his

issue, if he should have any, would be entirely left out. This would be contrary, we think, to the intention of the testatrix.

The chancellor, in his decree, appointed the appellant and Dr. Frazer receivers. That we consider unnecessary and unusual. The ordinary procedure, which we see no reason for disregarding in this case, is to have the two executors act under the authority of the equity Court, (*Bass v. Smith,* 189 Md. 461, 56 A. 2d 800) and we think that should be done in this case. The appointment of the auditor is a proper procedure, and will undoubtedly facilitate settlement of the estate, unless the auditor appointed does no more than his predecessor. We assume that this will not be the case, and that the court will see that the audit is stated promptly. The executors should be allowed such commissions as are provided in the statute, the chancellor determining what percentage they get within the limits prescribed. Under our conclusion we see no occasion for the executors to withhold distribution to the appellant of his share of the estate, nor is there any reason shown for their withholding distribution to Mrs. Frazer of her share. Their mother, in her will, provided for no trust, nor for any fiduciary to have charge of the property, and in the absence of any claim of imminent waste or destruction of the property, the court need not do what the will did not provide. On the other hand, if such a claim is made hereafter, the chancellor may readily appoint someone to hold and preserve the property which it is contended is about to be dissipated. A common procedure adopted in many of the equity courts of this State, is to have all of the securities transferred with the addition of the words "subject to the provisions of the will of ————", or "subject to the order of the Circuit Court for ——". This is an appropriate method of handling securities where they are held by a life tenant. As the chancellor is familiar with the property, and with the parties, we leave for him to determine, whether any such method should be adopted in this estate.

By paragraph (12) the testatrix directed that her property, both real and personal, be equally divided during the lives of her children. This provision should be carried out by the executors in their distribution account. If they do not agree, the chancellor can decide any disputed questions, and direct how the distribution shall be made. As the distribution is to be made now, seventeen years after the death of the testatrix, and the values of the property in the estate have probably changed materially, there should be a new appraisement. This will include "Foxley Hall", unless the son and daughter agree to keep it as a home for both, under paragraph (11), which seems improbable under the present circumstances. If they do not agree what is to be done with it, the chancellor can determine whether it should be allotted to either of them who wants it as a part of his or her share, or whether it should be sold and the proceeds divided as part of the estate. Paragraph (11) gives the executors authority to make such a sale, and to convey to a purchaser the interest of the testatrix in the property or to convey such interest to either devisee in the division directed by the court under the authority of paragraph (12).

In view of our conclusions, the decree will be affirmed in part and reversed in part, and the case will be remanded for the passage of an amended decree in accordance with this opinion, and for further proceedings. The costs are to be paid out of the estate.

*Decree affirmed in part and reversed in part, and case remanded for further proceedings. Costs to be paid out of the estate.*

Marbury, C. J. delivered the following supplemental opinion of the Court:

After the opinion in this case had been filed, the appellant petitioned the Court to include in its decision an affirmative statement of the construction of those

provisions of the will of Belle H. Tilghman by which pecuniary legacies and bequests of specific personal property were given. These provisions are contained in paragraphs 5, 6, 7, 8, 9, 10, 15, 16, 17, 18 and 19. Their construction was not discussed in the briefs or in the oral argument, and it had not been previously made known to the Court that any dispute existed as to their meaning. It appears now, however, that the appellees contend that the bequests in paragraph 17 are of the same nature as the disposition of Foxley Hall. There seems to be no dispute as to the interpretation of the other paragraphs above mentioned, and there is no necessity for quoting or discussing them. But in view of the fact that we were construing the entire will in the opinion, we have come to the conclusion that we should grant appellant's petition and state the proper construction of paragraph 17.

Paragraph 17 is set out in full in the opinion. The first sentence is the one in dispute. It reads "The pictures, portraits and furniture to be equally divided between them my children". We are not advised of the value of the furniture or the pictures or the portraits, but it seems to be perfectly clear that it was the intention of the testatrix to make an equal division of them between Colonel Harrison Tilghman and Mrs. Frazer. However, it is just such a bequest as this that causes trouble in families, because, frequently, the same parties will want some particular portrait or picture or piece of furniture which may not have any intrinsic value, but which may have some special sentimental value. If there are any such pictures or portraits or articles of furniture passing under paragraph 17, and the two children are unable to agree, then the Chancellor will have to decide according to his best judgment, after taking testimony, if he thinks it necessary. The paragraph has no connection with paragraph 11 which has to do with Foxley Hall. That paragraph we have already discussed. Pictures, portraits and furniture do not pass with the house in which they are located. The

house is ordinarily real estate and they are personal estate. The two kinds of property are essentially different and are disposed of under different statutes and rules of law. It is, of course, possible for a testatrix to provide that a house with all of its furniture, pictures and portraits shall go to some particular person or persons, but that was not done in this case, and we can see no force in any interpretation which holds that the articles bequeathed in paragraph 17 have any connection whatever with the provision as to Foxley Hall in paragraph 11.