TILGHMAN, Individually and as Co-Executor *v.*
FRAZER, Individually and as
Co-Executor, et al.

[No. 138, October Term, 1951.]

*Decided April 4, 1952.*

*Rehearing and modification denied May 6, 1952.*

622

The cause was argued before MARBURY, C. J., and DELAPLAINE and MARKELL, JJ.

*Harrison Tilghman* for the appellant.

*Amos W. W. Woodcock* for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is the fourth appeal, and our fifth opinion, in this case. *Tilghman v. Frazer*, 191 Md. 132, 59 A. 2d 781; supplemental opinion, 191 Md. 153, 62 A. 2d 596; *Same v. Same*, 197 Md. 478, 79 A. 2d 535; *Same v. Same*, 198 Md. 250, 81 A. 2d 627. This fourth appeal is from an order, dated September 18, 1951, overruling exceptions and finally ratifying (except two minor items not now material) a report (the fourth) and an (administration and distribution) account of the auditor, filed February 27, 1951. On the second appeal we said, "In the lower court on April 19, 1949 an amended decree was filed pursuant to our opinions, whereby among other things, a new special auditor was appointed to state an administration account and a distribution account. * * * On September 3, 1949 the auditor filed a second preliminary report, in which he stated fully his opinion

and conclusions on the contentions of the respective parties, his reasons and the authorities deemed pertinent, and set out fully his computations, showing, as of June 10, 1949, a cash deficiency of $10,036.45, 'reported at the amended figure of approximately the sum of $10,040'. To this report lengthy exceptions, in the nature of briefs with citation of authorities, were filed by both appellant and appellees. These exceptions were heard by the court and briefs filed. On August 21, 1950 the court filed a 'memorandum' expressing accord with the auditor's views, but expressly refrained from final ratification of the auditor's report, and instead filed an order requesting the auditor to file a third preliminary report, including computations only, showing the estimated amount of securities necessary to be sold [*i.e.*, the cash deficiency] as of September 1, 1950. On October 27, 1950 the auditor filed his third preliminary report in which he showed with computations only, 'the estimated amount of securities necessary to be sold as of September 1, 1950' to be $9,964.91. * * * At the argument we were informed that the auditor has recently filed a fourth report, bringing his accounts nearer up to date, to which exceptions would be filed within the few days yet remaining for that purpose. If and when this report, or any modified accounts in lieu of it, are finally ratified, such an order of ratification will be a final decree or order in the nature of a final decree." 79 A. 2d 536-538. The "fourth report" there mentioned is the one now before us.

We have found less difficulty in deciding the questions now before us than in finding what questions are before us. The printed appendix to appellant's brief contains much irrelevant matter, including old wives' tales of twenty, thirty and forty years ago, which we sifted, the relevant from the irrelevant, the sufficient from the insufficient, in relation to claims of appellant which we decided on the first appeal. On the other hand neither the auditor's fourth report, which contains his final computations, and ratification of which is now before

us, nor his second report, "in which he stated fully his opinion and conclusions on the contentions of the respective parties, his reasons and the authorities deemed pertinent", has been printed at all. Without printing papers to which the instant appeal directly relates, appellant in his briefs refers us to "facts" stated on specified pages in his briefs (not papers printed in the appendices) on the second and third appeals. The pages referred to in turn, or the instant briefs, or both, refer to (a) "facts" stated in his brief on the first appeal, with an incorrect statement that these "facts" "are now before this court pursuant to Rule 13 * * * relating to appeals * * *", and (b) many pages of unprinted transcripts and describe (c) still more numerous papers in the lower court which apparently have never reached this court in any form. Obviously these labyrinthine references to unprinted or non-existent papers in this court furnish us neither "facts" nor records on which to base judicial action. The court's memorandum of August 21, 1950 (which is printed) covers much of the ground covered in the same way in the auditor's second report. Appellant, not only in his briefs but in his exceptions, makes little or no distinction between facts and arguments. Though he complains copiously of what the auditor and the court have done, he seldom states specifically what they should have done and sometimes fails to indicate whether he asks that something complained of be undone at all. Without the auditor's computations before us, we could not review any details of the computations. It is, however, clear to what basic principles, underlying the computations, appellant objects. These basic principles we shall pass upon. We are not aware that appellant objects to any details of computation or other details of the report. However, any detail of the report not now before us will not be open on any future appeal, but is now finally decided by final ratification of the report without appeal as to such detail.

Appellant in his brief states ten questions as now before us. Practically all these questions are argumentative rhetorical statements of some phase of the one question really before us or of several other questions which we have heretofore decided, adversely to appellant, but which appellant seeks to raise in different form. It will not be necessary to discuss separately, or even mention, these ten so-called questions.

The basic question now before us is whether, as between life tenant and remainderman, in the absence of indication of a contrary intent by the testator, income received, during the period of administration, from that part of the testator's assets which eventually was sold and used to pay debts, administration expenses and legacies, goes to the life tenant as income or, together with the assets so sold and used, is part of the *corpus*. This question was decided by this court, by holding that such income goes to *corpus*, fifty-eight years ago. *Wethered v. Safe Deposit and Trust Co.*, (1894) 79 Md. 153, 28 A. 812; followed in *York v. Maryland Trust Co.*, (1926) 150 Md. 354, 133 A. 128, 46 A. L. R. 231. After considering appellant's earnest, elaborate and unique contentions to the contrary, we find no reason for now undeciding this question and deciding it in a different way. In the *Wethered* case, and in the development of the law in other jurisdictions, this question was a corollary to the question when the income of the life tenant of a residue begins. In the *Wethered* case this court held that when a testator gave all the residue of his estate, of every kind, in trust, to divide all the net income into five equal parts and to pay one part to each of five named persons for life, with remainder over, the life tenants are entitled to the whole net income from the residue from the death of the testator, and no portion of such income is liable for his debts or costs of administration, but they are payable out of *corpus*. The court said, "* * * according to most authorities, a bequest of the residue of the personal estate for life, with the remainder over, generally entitles the life tenant

to the income, commencing with the death of the testator; certainly as between the life tenant and remainder-man. Of course, the income from all the personal estate is as liable for the debts of the decedent as the principal, and must be so applied, if necessary; but when the estate is ample to pay all debts, expenses of administration and legacies, and there still remains a considerable residue, the income of which is, by the terms of the will, to be paid to life tenants, and then the *corpus* or principal to go to remainder-men, the above principles will apply, unless the testator has provided otherwise, or there be some peculiar circumstances which would change the general rule." 79 Md. 158, 28 A. 813. See *Miller* on *Construction of Wills*, § 135.

After deciding this basic question, the court disposed of the question now before us as a necessary corollary. "Of course the income on so much of the principal as must be sold and used for the purposes herein stated, will not be payable to the life tenants as the residue of the estate is lessened to [by] the amount of the principal so used." 79 Md. 163, 28 A. 815. The *Wethered* case was followed in the *York* case thirty-two years later, in which the court said, "We do not find in the testator's will any expression of intention that the debts should be paid from income, but we do think there is an indication that the wife was only to receive the income from the residue of the estate, after the payment of the debts, and under these circumstances it is clear that the rules laid down in the *Wethered* case and the other authorities heretofore cited should apply, and these rules are: (1) that the debts and expenses are payable from the corpus and not from the income; and, (2) that where a life tenant is entitled to the income, such income, in the absence of a contrary intention expressed in the will, is confined to that received from the residue, and does not ordinarily include the income derived from that part of the principal used to pay debts, expenses and specific legacies. It accordingly follows that in this case the interest items should have been charged

against the corpus of the estate, but it also follows that, since there was no contrary intention expressed in the will, the life tenant was not entitled to receive the dividends derived from the securities sold to pay the testator's debts, and as these dividends exceeded the amount of interest charged against her, she has suffered no injury. As a matter of fact, she has been overpaid, but as all the appellees have asked that the account be affirmed, we are not disposed to disturb it. The rule we have announced would also seem to be supported by reason, because if the life tenant is to receive the income from the gross estate while the corpus bears all the debts and expenses, it can readily be perceived that pending the settlement of the estate the corpus might become seriously impaired. For instance, in the present case, if it had taken four or five years to dispose of the assets at advantageous prices, and during this time the interest charges on the million dollar debt had been charged against the corpus, while the entire income went to the life tenant, the principal would have been depleted to the extent of two or three hundred thousand dollars, and in an extreme case the whole estate might be absorbed. On the other hand, under the rule we have applied the life tenant gets the income from the residue of the estate from the time of the testator's death. That is all the life tenant is entitled to after the estate has been settled, and in the absence of a contrary direction in the will, we are unaware of any sufficient reason why she should receive more while the estate is being administered." *York v. Maryland Trust Co., supra,* 150 Md. 368-369, 133 A. 133.

In *Merryman v. Long,* 49 Md. 540, 546, the court said, "Apart from any question of the payment of debts and expenses of administration, the widow would no doubt be entitled, under the will, to receive the income from the property from the time of the testator's death. *Angerstein v. Martin,* 1 Turner & Russell, 232; *Hewitt v. Morris,* Ib. 241; *Terreire v. Bulmer,* 2 Sim. 18; *Sargent v. Sargent,* 103 Mass. 299; *Evans v. Iglehart,* 6

G. & J. 193", but nevertheless held that the income of the estate for the first year was assets in the hands of the executor and the application of it to the payment of debts and expenses, in order to save the *corpus* of the estate, was equitable, in accordance with the due and proper course of administration, and for the interest of the testator's widow, the life tenant. The court said, referring to the widow, "She had no right to insist that the *corpus* of the estate should be sold to pay the debts, when the executor had in hand money sufficient for that purpose, collected from the rents of the leasehold property." 49 Md. 547. In the *Wethered* case, *Merryman v. Long* was distinguished in part because "the property consisted chiefly of improved leasehold estate", which for some reason seems to have been regarded as a particularly safe trust investment. In no case since *Merryman v. Long* has this court held that income from a residue (over and above income from that part of the testator's assets sold to pay debts and expenses) should be used to pay debts and expenses and not (directly or indirectly by sale of property) paid to the life tenant.

From the *Wethered* case in Maryland, and from a much earlier date in England, the rights of life tenants in respect of income have been enhanced. In *Proctor v. American Security and Trust Co.*, 69 App. D. C. 70, 98 F. 2d 599, 600-601, the Court of Appeals of the District of Columbia, in its opinion by Judge Vinson (now Chief Justice of the United States) said, "In the long ago, the life beneficiary of a residuary trust received no income during the administration of the estate. After payment of costs of administration, debts and legacies, the residue was transferred to the trustee. Income produced thereafter was paid to the life beneficiary. The reason for such rule, as generally expressed, was that during the period of administration the residue had not been ascertained. All monies earned upon the property of the testator during the administration of the estate, not having been disposed of by will, were a proper part of the residue. Life beneficiaries suffered hardships.

Delay in the administration occurred through proper cause, or through inaction or non-action of the executor. It was then argued that the life beneficiary of a residuary trust was closer to the heart of the testator than the remainderman, as such life beneficiary had been named first to benefit from the residuary trust. And it was successfully contended that such life beneficiary should have the income from the clear residue from the date of testator's death. It is now the accepted rule that, in the absence of controlling language in a will, the life beneficiary is entitled to the income of the *clear residue, as afterwards ascertained,* to be computed from the death of testator." In *Sitwell v. Bernard,* (1801) 6 Ves. 520, a testator directed that the residue of his personal estate be invested in real estates, on specified trusts for life, with remainder over, and the income of the residue accumulate and be so invested. The Lord Chancellor (Lord Eldon) held that as the will expressly directed accumulation but did not name the period of it or specify the beginning of the life tenant's income, the will should be construed as entitling the life tenant to income after one year, the usual period for administration. More than twenty years later, this case was distinguished by Lord Eldon in holding that the life tenant ordinarily is entitled to the income, from so much of the personalty as is not necessary to be applied to the payment of debts and legacies, from the death of the testator. *Angerstein v. Martin,* (1823) Turner & Russell 233; *Hewitt v. Morris,* (1823) Turner & Russell, 241.

Long since the *Wethered* case—largely since the *York* case—a conflict in the authorities has developed. In the greater number of jurisdictions the law is in accord with Maryland law, but a few jurisdictions have adopted a so-called "Massachusetts rule", which is at variance with the "general", or Maryland, or former New York, or "English" rule. In the *Proctor* case the court, by Judge Vinson, said, "It is fair to say that there are two irreconcilable rules which have grown up in this country

in respect to the point involved. There is the general rule, supported by the decided weight of authority in this country, and, likewise, the English cases, that the earnings upon testator's property, derived during the course of administration, used to pay costs of administration, debts and legacies, if not disposed of by the express terms of the will, are added to the residuary trust as part of its *corpus.* Then there is the so-called Massachusetts rule, which crystallized in 1929 [*Old Colony Trust Co. v. Smith*, 266 Mass. 500, 165 N. E. 657], which holds that the earnings upon testator's property used to pay costs of administration, debts and legacies derived during the course of administration, if not disposed of by the express terms of the will, are distributable to the life beneficiaries as income. The general rule finds support in the courts of New York, Maryland, Connecticut, Kentucky, New Hampshire, Delaware, New Jersey and the English cases. The Massachusetts rule is followed in the courts of Rhode Island and North Carolina." *Proctor v. American Security & Trust Co., supra,* 601-602. In New York the former rule was changed by statute. Laws of 1931, c. 706, Personal Property Law, sec. 17-b, McK. Consol. Laws, c. 41. In Maryland the Act of 1949, ch. 672, Code, Art. 93, sec. 372, apparently modeled after the New York statute, is applicable only to testators who die after the passage of the act. Appellant says the Act of 1949 substitutes the Massachusetts rule for the *Wethered* case. As to the construction or operation of the Act of 1949 we express no opinion.

The merit of the Massachusetts rule is simplicity, *i.e.*, it can be applied, without the use of arithmetical—or algebraical—formulas in more or less complicated computations. The defects of the rule are that it (1) is unsound in principle in distributing, as income of the residue, income from property that never was part of the residue, and (2) consequently is unsound in practice in giving the life tenant more income for the initial year or years than for subsequent years. When admin-

istration of an estate is promptly completed the defects of the rule are often mitigated by the circumstance that the difference between the results of the two rules is small. In the instant case the results of the defects of the rule are magnified by the inordinate delay in administering the estate.

This court has not had occasion to express in a formula the principle established and applied in the *Wethered* and *York* cases. In the instant case the auditor followed the formula stated in Section 234, comment *g*, of the *Restatement* of *Trusts*: "*g. Income on property used in paying legacies, debts and expenses.* To the extent to which the income received by the executor during the period of administration is derived from property which is subsequently used in paying legacies and discharging debts and expenses of administration, and has not been applied to the payment of interest on such legacies, debts and expenses, the trustee is entitled to receive the same, but it should be added to principal and not paid to the beneficiary entitled to income. A proper method of determining the extent to which legacies, debts and expenses of administration should be paid out of principal is by ascertaining the amount which with interest thereon at the rate of return received by the executor upon the whole estate from the death of the testator to the dates of payment would equal the amounts paid. This amount is charged to principal and the balance of the amount paid is charged to income. *Illustration*: 3. A bequeathes $30,000 to B and all the residue of his property to C in trust to pay the income to D for life and on D's death to pay the principal to E. The value of A's estate at his death is $100,000. During the year after his death the income received by his executor is $5,000. At the expiration of the year the executor pays the legacy of $30,000 to B and pays $10,000 in discharging A's debts and the expenses of administration. Of the $40,000 so paid, $38,095.23 (the sum which with interest at five per cent for one year would equal $40,000) is charged to principal, and $1,904.77 is charged

to income. D is entitled to receive as income for the first year after A's death $3,095.23; the remainder of the estate amounting to $61,904.77 is principal of the trust estate."

Professor Scott points out that, in jurisdictions which have not adopted the Massachusetts rule, more than one formula has been used in apportioning income during administration. After stating the rule stated by Judge Vinson in the *Proctor* case as the "general rule" [*supra*], he says, "This method of allocation is the method which was followed in New York until the rule was changed by statute. It is also the method followed in Maryland and in the District of Columbia. The same method was applied in some of the earlier English cases, and in a New Jersey case, which is probably not now followed." *Scott* on *Trusts*, § 234.4. We do not think that this method has been or should be followed literally in Maryland. It might perhaps be a logical result of regarding Judge Boyd's concise statement of legal principle in the *Wethered* case—or Judge Vinson's statement in the *Proctor* case—as a mathematical formula. Indeed the same statement as Judge Vinson's is made in the first sentence quoted [*supra*] from the *Restatement* of *Trusts*. We think, however, that neither Judge Boyd's statement, nor Judge Vinson's, nor the first sentence quoted from the *Restatement* can be so regarded. Judge Vinson, in the last paragraph of his opinion, disclaims passing upon computations, and says, "We do not decide the method of computation." 98 F. 2d 604-605.

Professor Scott says, "There is another method of apportioning the income received during the period of administration. This is the method adopted by the English court in the leading case of *Allhusen v. Whittell*, [L. R. 4 Eq. 295 (1867)] and followed in later English cases. [*Lambert v. Lambert*, L. R. 16 Eq. 320 (1873); *In re McEuen*, (1913) 2 Ch. 704; *In re Wills*, (1915) 1 Ch. 769]" *Scott, Ibid.* This method is the one stated in the second sentence and the illustration quoted from the *Restatement*. The difference between these two

methods is the mathematical difference between computation of "discount", as such, and computation of "present worth". The latter method is more exact, and as shown by the illustration in the *Restatement,* and stated by Professor Scott, gives the life tenant the same income (on the same facts, *e.g.,* values and rates of return) in every year. The other method gives the life tenant slightly less income in the first than in subsequent years. The auditor followed the correct method.

Appellant, by synthesis of unrelated statements in the *Wethered* case (which he says was rightly decided) and earlier cases, has stated what he calls "the law of Maryland", which is not stated in any case in this or any other court—unless in English cases which appellant says establish what he calls "the English rule". The characteristic of appellant's "law of Maryland" which distinguishes it from the "general rule", the Massachusetts rule and every other rule on the subject, is that income, *for the first year only,* on property sold to pay debts, legacies and administration expenses, becomes *corpus* and does not go to the life tenant. This result is reached by combining *Merryman v. Long* and the *Wethered* case in such a way as to ignore the true relation between those cases, viz., that the result in the *Wethered* case (except in so far as *Merryman v. Long* was distinguished on the facts) was the exact opposite of the result in *Merryman v. Long.* In *Merryman v. Long* it was held that *all* the income *from the residue* for the first year (the normal period for administration) was applicable to payment of debts and expenses of administration; in the *Wethered* case, that all such income went to the life tenant. The question at issue in the instant case, decided in the *Wethered* case but not presented in *Merryman v. Long,* is what *is* income *from the residue.* The opinion in the *York* case, which applied the *Wethered* case without limitation to one year, and recognized the applicability—the special fitness—of that rule "if it had taken four or five years" to complete the administration, appellant says is *dictum* and error,

has misled the auditor and the lower court and has produced still more dire results in other jurisdictions. The Maryland rule in this way (appellant says) "has been misconstrued and overextended in a number of cases in certain other (by no means all) jurisdictions. * * * The substitution in the *York* opinion of the words 'intention expressed in the will' for the correct words 'the intention of the testator as gathered from the will' * * * is particularly unfortunate. * * * it has produced a mistaken view in other jurisdictions as to the Maryland law, and also in the minds of commentators and annotators, where the language * * * in the *York* opinion has been accepted without testing it against the Maryland cases which [the opinion] cites as controlling and says [it] intends to express. This erroneous result is apparent * * * in the opinion [of Judge Vinson in the *Proctor* case]."

Appellant's contention, greatly abbreviated, is that the opinion in the *York* case on the question in the *Wethered* case is *dictum* in three respects, (1) it was not necessary to the decision; [The passage quoted (*supra*) from the *York* opinion shows that the rule in the *Wethered* case was applied to the facts, with the result that the appellant was found to have received more, not less, than she was entitled to, and the order was accordingly affirmed.]; (2) in the "substitution" of "intention expressed in the will" for "intention as gathered from the will", with repeated argument by appellant on the difference between *explicit* and *implied* statement of intention, and (3) in stating that "the rules laid down in the *Wethered* case and the other authorities heretofore cited should apply" and failing to apply them properly. This makes it improper (appellant says) for the auditor or the lower court to apply the opinion in the *York* case without "adjusting" what the court said in that opinion to what it intended and undertook to say. When counsel considers that an opinion of this or any other court is erroneous, in principle or because out of line with prior—or subsequent—cases, there is no reason

why he should not say so (if pertinent) and state his reasons. But calling an opinion *dictum* because it is wrong—like calling an arithmetical error *dictum*—and argument about "adjusting" what a court said to what it should have said, or about the difference between "intention expressed in the will" and "intention as gathered from the will", is merely darkening counsel with words without meaning.

Appellant's statement of "the law of Maryland" is more illogical in principle, more incongruous in results and more complicated in application than either the general rule or the Massachusetts rule. It applies one rule for one year and the opposite rule thereafter. A life tenant gets less in the first year than in succeeding years (if any) of administration, and after administration is completed, gets still less, or nothing at all if the administration lasts long enough to consume the entire *corpus*.

The "English rule", as appellant states it, like his own "Maryland law", contains the one year limitation, and (he says) is supported by the early cases of *Angerstein v. Martin, supra, Hewitt v. Morris, supra,* and *Allhusen v. Whittell, supra.* All these cases refer to one year as the usual period for administration. The *Allhusen* case does contain words (but no reasoning) capable of being literally construed as making reference to one year a limitation upon the rule and not a mere illustration. No other cases have been cited, and we have found none, which mention one year as an apparent limitation upon the rule. In England, it was decided, thirty-seven years ago, that the rule in *Allhusen v. Whittell* is the same whether administration is completed in one year or five years. The mention of one year is only illustrative, not limiting. *In re McEuen, supra,* 704, 717; *In re Wills, supra,* 777-778. These cases, which are not cited in appellant's briefs, destroy the sole semblance of authority for appellant's "Maryland rule".

In the instant case the auditor apportioned income since March 17, 1933 (the end of the two-year period of accumulation prescribed in the will) to December

31, 1950. The total income received, $12,571.82, divided by total intangible *corpus* (including $1,020.33 cash), $19,778.20, shows a rate of return (for almost eighteen years) of .63554. Total *corpus* allowances, $17,549.33, less cash, $1,020.33, leaves $16,529.00, "net obligations", *i.e., corpus* allowances paid or payable after cash *corpus* is exhausted. If x equals the amount of net obligations chargeable to *corpus,* then x plus .63554x equals $16,529.-00, net obligations, and x equals $10,106.14, leaving $6,422.86, net obligations chargeable to income. Under appellant's contention apparently all or substantially all of this $6,422.86 would be distributable as income, and *corpus* for the benefit of life tenants and remaindermen would be depleted accordingly. The life tenants would receive an inflated income for the eighteen years; thereafter the *corpus,* and correspondingly the income, would be almost (perhaps completely hereafter) exhausted.

The "general rule" (to which we adhere), like all other rules of construction—including appellant's rule—is applicable only in the absence of indication—explicit or implicit—by the testator of a different intention. The difficulty about any such indication of intention is (at least in the application of the "general rule") that there is seldom any indication of intention beyond what is "explicit or implicit" in the word "residue" or equivalent words. A bequest of the income of a residue ordinarily is regarded as indicating an intention not to include income from property which is not a part of the residue. In the instant case the testatrix (in what appellant calls her "home-made" will) does not use the word "residue", but inasmuch as she makes a number of pecuniary and specific bequests, paragraph (12), "My estate I wish both real and personal to be equally divided between my two children—during their life time", is in fact a residuary devise and bequest and "my estate" is equivalent to "the residue of my estate". Nevertheless appellant contends (aside from his argument as to "the law of Maryland") that the will of his testatrix does

indicate a contrary intention. He says Paragraph (22) of the will, "I intended to direct and wish if possible my legacies to be paid out of income—I therefore direct my executors to take two years to settle my small estate if necessary", indicates an intention to "accumulate" income for two years and no longer. He even argues that because the testatrix and her sister had never in their lifetime completed the administration of their father's and mother's estates, she expected and intended —and it is implicit in her will—that the settlement of her estate would be similarly delayed. We think Paragraph (22) plainly indicates a reasonable expectation (shown by the event to have been vain) that two years would be a maximum period for the settlement of "her small estate". Aside from the plain meaning of the will, appellant's argument is a *non sequitur*. The fact that for two years the testatrix diverted from the life tenants to payment of legacies, all income from the residue is no indication of an opposite intent, after two years, to divert to the life tenants income from property that was not a part of the residue, and thus to consume the *corpus* in the expense of endless delay in the administration of her estate.

Under Paragraph (20) of the will, "To my dear husband Oswald Tilghman should he survive me—a life estate in all my property. At his death to be equally divided as I here before directed", the auditor allowed to the estate of Colonel Oswald Tilghman as income from March 5, 1931 (the date of the death of the testatrix) to June 17, 1932 (the date of his death) $1,374.92. Appellant complains that this was the gross income of the testatrix's property, without any deduction for income from property subsequently sold to pay debts and administration expenses. Appellant's complaint, however, is not that gross income (instead of income from the net residue) was allowed to his father's estate, but that similar allowance was not made to him (and his sister) as succeeding life tenants. The difference in the allowance to the father's estate could not exceed

or equal $100. We are not called upon to decide whether the allowance to that estate was properly computed, or whether in this respect Paragraphs (12) and (22) could be differently construed. Appellant complains, but does not except to the allowance to his father's estate. In the auditor's second report he said of this allowance of $1,374.92, "both executors and your auditor agree that the late Colonel Oswald Tilghman, by the 20——para-graph of the will, became entitled to this income". As to this allowance, the order of the lower court is a consent order. We express no opinion regarding it.

On the first appeal in this case we reviewed, among other matters, two claims by appellant against his testatrix's estate, (a) a claim (which we denied) for specific performance of an alleged contract to leave him one-half of her estate, including "Foxley Hall" at a valuation of $8,000 (191 Md. 142-145), and (b) if such an enforceable contract does not exist, an "alternative claim", filed in 1932, "for interest from one year after the respective deaths of his grandfather and grand-mother on the two legacies which his mother used during her lifetime." We held "that the appellant has waived any right to interest on these legacies during his mother's life, although we agree with him that what his mother intended to do by paragraph Three was to pay a debt. The debt she directs to be paid to him here is all the debt that her estate owes him, with respect to these legacies, and no interest should be allowed upon it. *Turk v. Grossman*, 179 Md. 229, 17 A. 2d 122." 191 Md. 132, 145-147, 59 A. 2d 781, 787. Without filing a new claim (after twenty years) or obtaining or asking leave to do so, appellant now seeks to resurrect his denied claim for *interest*, as a claim for *income* from misap-propriated trust funds, consisting of the same legacies. To support this claim, he gathers together and prints in his appendix ancient matter which was before us in connection with his denied claim and is now wholly ir-relevant, and also *after appeal* filed a "request for ad-mission" of facts. The "request for admission", after

appeal, would be overdignified if we said more than that it is preposterous. We need not pursue any of appellant's contentions as to whether "debts" include "fiduciary debts" or as to the differences and similarities between a claim or debt for misappropriated trust funds and a pursuit of the funds in specie if sufficiently earmarked. His present contentions are without basis either in law or in fact. Since we have decided that the amount of the legacies, *without interest,* "is all the debt that her estate owes him, with respect to these legacies", he cannot get any more by calling it "income" or by any other name. Furthermore, the record is devoid of evidence sufficient to trace and earmark misappropriated trust funds of years ago.

Appellant asks interest on a $50 legacy paid by him personally many years ago. This claim was denied by us on the first appeal (191 Md. 147-148, 59 A. 2d 781) without reservation for a claim for subrogation, which appellant now makes.

Appellant says, in his brief, not in his exceptions, that the auditor has allowed for collateral inheritance tax on charitable legacies which, by the Act of 1943, were retroactively exempted from that tax. *Shaughnessy v. Perlman,* 198 Md. 619, 85 A. 2d 38. Our affirmance of the order of the lower court in this case will be without prejudice to the withholding of any such repealed tax.

We can only hope, without much confidence, that this will be the last appeal in this case, and (what is much more important) that the case in the lower court will move to an early close.

On the first appeal in this case we said, "Many factors contributed to the delay in the settlement of all these estates. They were handled entirely within the family, and like so many family matters, they were not handled with the care, particularity, and dispatch which is requisite to a proper settlement of the affairs of a decedent. After the death of Mrs. Belle H. Tilghman, difficulties

and disagreements arose between the appellant on the one side and the appellees on the other. Each side accuses the other of being responsible for the delay. Each is in some measure correct. However, the matters in dispute have now been brought to a head and can be finally settled in the case before us." 191 Md. 138, 59 A. 2d 782. This then seemed a conservative expectation; in the event it has become a vain blasted hope. On the third appeal we said, "There is no escape from the fact that an unreasonable delay has occurred in bringing this rather simple estate to a conclusion. * * * This delay is inexcusable and intolerable. Any third person injured by the delay of twenty years might well be afforded relief against both executors. * * * Both executors are equally responsible for the proper and prompt administration of their decedent's estate. Each owes to the other a reciprocal obligation to do his duty and to see that his associate meets his obligation. * * * Twenty years delay could not have occurred if either executor had done his full duty." 198 Md. 256, 81 A. 2d 630. We have repeated these statements for two reasons, (1) appellant by incessant repetition of his contentions on the third appeal indicates failure to understand that we have held him and his co-executor to be each a major contributing cause responsible for all delay that has occurred, regardless of other contributing causes, and (2) the delay in this case has grown to the dimensions of a public scandal, which has brought the administration of justice and law into disrepute. The integrity of the executors is not questioned, but they lack all sense of proportion and apparently are congenitally incapable of prompt action. If either put any value on his own time he would years ago have devoted his attention to having both executors removed and one competent person appointed in their place. The executors' commissions allowed in the account (less taxes) are $2,183.71, *i.e.*, $1,091.85 each, which is less than $5 per month each for twenty years. The following statement in the audi-

tor's report, relating to a matter of no importance in itself, illustrates the addiction of the executors to delay and their lack of a sense of proportion, "That the federal income tax payments mentioned on page 7 of the within account have not been audited by the United States Collector of Internal Revenue; nor has a waiver of penalties for late filing of the returns for the years 1943 through 1947 been obtained. These penalties, if finally assessed, will amount to the sum of $13.83; but claims have been prepared for filing with the returns for the said years, requesting that no penalties be assessed."

If we had held "the law of Maryland" to be what appellant contends it is, or if this case were subject to the Act of 1949 and that act were construed as appellant construes it, we should then have been confronted with the question whether appellant could take advantage of his own wrong by consuming *corpus* in administration expenses through inordinate delay caused or contributed to by him. On that question we express no opinion.

In the further progress of this case the lower court should subordinate the willingness of the parties to delay to the public interest in bringing this scandal to an end. If the lower court feels that at this late date any good could be accomplished by removal of the executors, we have already found sufficient ground for such action at any time. On the first appeal we mentioned the possibility of appointment of someone to hold and preserve property for life tenants and remaindermen. 191 Md. 152, 59 A. 2d 781. In his brief appellant indicates that he may ask such action. We suggest that in the event of resignation or removal of one or both executors, or any other vacancy or any occasion for appointment of any custodian or fiduciary of any kind, the court should not appoint either of the executors, or any party to this case, or counsel for any party, but should appoint some one impartial person, selected by the court and not by the parties. We recognize that this suggestion is not in accord with customary practice in

Maryland and we confine the suggestion to the instant case on its own facts.  *Pritzker v. Stern,* 187 Md. 499, 51 A. 2d 69.

*Order affirmed and cause remanded, costs to be paid by appellant, individually.*