WILLIAM H. ATKINSON ET AL. *v.* EMMA VIRGINIA ATKINSON ET AL.

[No. 19, October Term, 1929.]

*Decided November 14th, 1929.*

The cause was argued before BOND, C. J., URNER, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*W. Calvin Chesnut* and *Thomas J. S. Waxter,* with whom were *J. Howard Murray* and *Joseph L. Donovan* on the brief, for the appellants.

*Edward H. Burke,* with whom were *Bowie & Burke* on the brief, for the appellees.

URNER, J., delivered the opinion of the Court.

The deed of trust involved in this litigation was decreed to be invalid upon the ground that the grantor was under a mis-

apprehension as to its real effect. In our opinion that conclusion was justified by the evidence. The grantor was seventy-one years of age, enfeebled by a recent illness, and suffering from the shock of his wife's sudden death, when, on the day after her funeral, he executed the deed in controversy. It conveyed his whole estate, estimated to be worth from $6,000 to $8,000, in trust for his benefit for life, and after his death for the trustee individually and three other remaindermen. The instrument was prepared by the grantor's lawyer, Mr. Donovan, at his office, in pursuance of instructions communicated by the person designated in the deed as the trustee and as one of the beneficiaries. After its execution, at the grantor's home, the deed was kept in Mr. Donovan's possession for nearly a month. During that period he was twice interviewed by the grantor in regard to the effect of the deed upon the use and disposition of his property. He was informed that the deed had not yet been recorded and could be destroyed or changed if he so desired, and that his property interests were still within his control. Shortly after the second interview Mr. Donovan had the deed recorded. This action was taken by him in the evident belief that it was in accordance with the grantor's purpose, but the proof is not satisfactory as to such an intention. Both before and after the deed was recorded, the grantor exercised full rights of ownership over the property and funds which it purported to transfer. He does not appear to have learned of its registration until the fact was reported about a month later in a newspaper. Within a few weeks after receiving this information he died as the result of an accident. In the meantime he had made a third visit to Mr. Donovan and expressed to him a wish to make a change in the trusteeship. Prior to the newspaper reference to the deed of trust, the grantor made declarations, according to the testimony, indicating his belief that he had simply appointed a "committee" to attend to his property interests if he should be unable to give them his personal attention. His original plan was that the "committee" should consist of four persons, who were named in the instructions given for the preparation of the

deed, but at Mr. Donovan's suggestion, with a view to the more convenient management of the estate, a single trustee was appointed. The trustee and the remaindermen were all related to the grantor by blood or marriage, but they are not included among his next of kin or heirs at law.

The following testimony of Mr. Donovan, who acted in good faith throughout the transaction, is important upon the question as to the existence of a reasonable ground for a misconception by the grantor with respect to the force and effect of the deed. Referring to the circumstances of its execution, Mr. Donovan said: "I explained to him the character of the paper I had prepared was a deed of trust. I told him the provisions of it, that it was in the usual form and that a trustee would take charge of the property, collect the rents, and so forth, and out of the rents and receipts pay his expenses and use the money for his benefit, and included in there the provision that if necessary all the money could be used and the real estate sold for his benefit. He said, 'I guess that will fill the bill, let's fix her up.' I got a pen and he said, 'my hand is too shaky to sign my name.' So I held the pen while he made his mark. * * *." After its execution the deed was read by Mr. Donovan to the grantor, who asked, "What are you going to do with it," and, in reply, Mr. Donovan testified: "I told him I would take it to my office, fill in the blanks and put it on record later, and if he wanted any changes made they could be made. I took it down to my office and kept it in my safe until I sent it over here to be recorded on March 9, 1928. * * *." On the occasion of the grantor's first visit to Mr. Donovan after the signing of the deed he asked whether it had been recorded, and, as Mr. Donovan testified: "I said 'No'. He said 'get her out, let's read it.' He sat down and I read it over slowly and carefully. He said, 'I guess she's all right.' I said, 'Mr. Atkinson, the deed is still in my possession as your property. If there is anything about it you don't like or don't want, we can tear it up and throw it in the waste basket.' He said, 'let her stand as she is'." During that interview the grantor asked, "What about my money, they say I can't have it?," and Mr.

Donovan replied: "That isn't true, nothing has been done yet. You can get any amount you want." When the grantor called the second time, the deed was again read to him, and Mr. Donovan said: "This deed hasn't yet been placed on record and if you want to destroy it and give your property to an orphan asylum, you can do it." In the further course of his testimony in reference to the second visit Mr. Donovan said: "I still told him he could do as he pleased with his money, that he could tear the deed up if he wanted. He said 'some of them told me I had strapped myself and couldn't get a dollar.' I told him the deed of trust provided he could have every cent he needed."

This testimony is not inconsistent with the understanding of the grantor, proved by his declarations, that he was not finally and irrevocably divested of title to his estate by the deed which he had executed and left in the hands of his attorney. There was no direction, so far as the evidence shows, that the deed should be recorded or delivered to the grantee. While it remained in the custody of Mr. Donovan it was revocable, as he explained, and the grantor may well have believed, under the circumstances, that his right of revocation would continue until he should expressly authorize the recording and delivery of the instrument. The assurance that under the deed of trust "he could have every cent he needed all his life" was based upon the theory that the trust would be liberally administered for his benefit. But by its terms the trustee was directed to use such part of the principal as "in his judgment" would be necessary and proper for the care of the grantor during his lifetime, if the income should be inadequate, and that discretion was committed to a trustee who was interested personally in the estate as a grantee in remainder. The record convinces us that the grantor did not intend to relinquish control of his estate to that extent. His physical and mental debility, as described by his attending physician, while perhaps not so serious as to render him wholly incapable of executing a valid deed or contract, was sufficient to account for his apparent failure to comprehend clearly the real effect of the

652

deed of trust and the true intent of his attorney's explanations. There was no consideration for the deed, and as it appears not to be in accord with the grantor's actual purpose and understanding, we shall affirm the decree declaring it inoperative.

*Decree affirmed, with costs.*