PAUL R. BUCHWALD, JR., *v.* MORITZ G. BUCHWALD, ET AL.

[No. 57, April Term, 1938.]

*Decided June 14th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*James E. Godwin,* for the appellant.

*Charles W. Main,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Paul R. Buchwald, Sr., then past eighty years of age, died on August 3rd, 1935, apparently at his home in Baltimore, leaving to survive him three sons, Paul R. Buchwald, Jr., Johannes E., and Moritz G. Buchwald, one daughter, Louise J. Buchwald, now known as Sister Clementine, and four grandchildren, Albert, George, Norman and Naomi Buchwald, children of a deceased son, Bruno A. Buchwald, and leaving also a will dated June 22nd, 1935, which in due course was admitted to probate by the Orphans' Court of Baltimore City.

Among its other provisions that will contains these:

"1. I have deposited in the safe deposit box in main office of Provident Savings Bank a letter addressed and sealed to my oldest son Moritz G. Buchwald which letters contain his share in my estate.

"2. I have deposited in same manner and place a letter addressed to my daughter Louise Johanna Buchwald now Sister M. Clementine which letters contains her share in my estate.

"3. I have deposited in same manner and place a letter addressed to my son Paul R. Buchwald, Jr. which contains a deed to my properties No. 4603-4607 Harford Road and which conveys this property absolutely and without any obligation to said Paul R. Buchwald Jr. this letter also contains a transfer of my shares in the firm of Paul R. Buchwald Inc. to my son Paul R. Buchwald, Jr.

"4. I have deposited in the same manner and place a letter addressed to my son Johannes Edmund Buchwald which contains the receipt for the money I loaned to Johannes Edmund Buchwald and his wife also receipted tax bills for property on Taylor Avenue Baltimore County which I paid to keep the property out the tax sale. The Favorite Building and Loan Association Book No. 1 will be turned over to above Johannes Edmund Buchwald by the administrator of my estate."

On August 7th, 1935, Paul R. Buchwald, individually and as executor of that will, filed the bill in this case against the heirs at law of Paul R. Buchwald, Sr., in which he alleged that he was unable to determine the legal effect of the bequests made in the will, and in which he asked the court to construe it. The several defendants answered, and the case was heard on those pleadings, and on testimony taken in another case pending in the same court, in which Moritz and Johannes were complainants and Paul R. Buchwald, Jr., defendant, which the parties to this case stipulated should be considered as though taken and filed herein.

At the conclusion of the case the court passed this decree:—"By the true construction of the last Will and Testament of Paul Richard Buchwald, deceased, dated June 22, 1935, Clauses 1, 2, 3 and 4 of said Last Will and Testament are inoperative and void because of the absence of words of gift in said clauses, and with respect to Clauses 1 and 2, for want of proper description of the contents of the letters mentioned in said clauses; that clauses 5, 6, 7, 8, 9 and 10 of said Last Will and Testament are hereby declared valid." From that decree Paul R. Buchwald, individually and as executor of Paul R. Buchwald, Sr., took this appeal. It is not denied that so much of the decree as relates to clauses 5, 6, 7, 8, 9 and 10 of the will is unobjectionable, so that the rulings as to them are not in issue.

That the questions raised by the ruling as to clauses 1, 2, 3 and 4 may be better understood reference will be made to the situation of the testator, and to his relations with his children and grandchildren at the time the will was made.

Paul R. Buchwald, Sr., for many years prior to his death was engaged in a plumbing business which he carried on through the instrumentality of a corporation, Paul R. Buchwald, Inc. His son Paul was associated with him in the business from 1902 until the father's death, and his son Bruno intermittently until 1922, but from that time continuously until his, Bruno's, death in

1933. His relations with his sons were not uniformly pleasant, but while his differences with them were transient, he nourished a deep seated and inveterate dislike for their wives.

Of the outstanding shares of the capital stock of the corporation he held one hundred and eighty-nine shares, his son Paul ten shares and Johannes one share, and Paul was the secretary and general manager.

Some time before his death, perhaps as early as December, 1934, possibly earlier than that, the testator's health began to fail, and on December 20th, 1934, he addressed to "Whom it may concern," a paper signed by him and attested by two witnesses, in which among others he gave these directions:

"I the undersigned Paul R. Buchwald do herewith give to my son Paul R. Buchwald, Jr. the Authority as my Administrator & Executor & none of my other children shall interfere with his Authority as my funeral, etc.

"I want a plain funeral not to cost more as One Hundred-and fifty Dollars, ($150.00) laid out in my Tuxedo, my corpse cremated & the ashes buried on the side of my wife's grave in Flint Hill Cemetery near Vienna, Va. in such a way that the plants get not disturbed. * * *

"After my funeral my Executor shall take my last will & testament out of the safe, have seals examined, he shall open the Envelope on the small side without destroying the seal.

"He shall read my last Will & Testament, next morning he shall go with the other heirs to the main office of the Provident Savings Bank, get my Safe Deposit Boxx & give to each of my children, the addressed envelope, Each to examine the seals & give my Executor a receipt for the letter etc. Neither of the heirs shall ope the letter until he is in his own home.

"If my daughter Louise (Sister M. Clementine) can not come personally, here envelope shall be placed in a extra envelope & be send by registered letter o dlivered personaly. All the small articles no mentioned in my lat will & testament shall belong to my son Paul R. Buch-

wald, jr. absolutely, none of my other children shall have the right to examine the contents of the safe or the books of the firm Paul R. Buchwald, Inc. May God forgive my sons Morits & John, also my Dauchters in law all the bad things same have done against me during the last Years of my life.

"This was written without any influence of anybody & is exactly as I feel about the Threadment I have received, Executed in 2 copies."

Earlier than that, in 1933, he had had another will drawn which has disappeared and there is no description of its contents in the record, but after he executed the paper of December 20th, 1934, he sent for his attorney and showed him the draft of a will which he himself had drawn, substantially the will in issue here, and requested him to read it and have it typewritten. The attorney did read it and advised the testator that it was not in proper form, and then this colloquy took place:— "I had discussed with him a short time before about drawing a will and he would draw the paper himself and read it to me, and then give it to me to typewrite. That is what he did in this case, the same way. Then after he read the will, which is this will here, I told him, 'I don't think that is a proper will for you to draw and I don't like to do that.' He said, 'It is my money, I don't see why I can't do what I want.' I said, 'On account of the Orphans' Court; you have to go in there, there has to be an appraisement, I have to have an inventory'. I said, 'By putting it in these envelopes that would not be possible.' He said, 'I don't want the Orphans' Court to get all my money.' I said, 'You think it over, I won't draw that will the way you want it now.' So when this deed came along that is the reason I made the statement to him at the time, because knowing that he wanted to put the deed in an envelope and to lock it up in the safe deposit box, that is the reason, that if he wanted this deed to be effective, it had to be delivered, there had to be a delivery of it." He again sent for his attorney in May 1935 and instructed him to draw a deed conveying property known as 4603, 4605 and 4607 Harford Road

to his son Paul R. Buchwald. The deed was drawn and he executed it on May 22nd, 1935, and handed it to the grantee and told him to "put that away safe". Paul took it, and without recording it, placed it in his drawer in the office safe. On or about June 24th, 1935, Mr. Buchwald, Sr., also assigned to Paul his one hundred and eighty-nine shares of the capital stock of Paul R. Buchwald, Inc., and delivered the certificate to him.

After the death of Buchwald, Sr., Paul took from his father's safe deposit box a bundle of papers which in his testimony he describes in this way: "That was one package wrapped up and sealed. Q. One package? A. Yes, sir; all in one package. Q. When were they tied up? A. I don't know. Q. You don't know when they were sealed? A. No, sir. Q. When did you carry it down there and put it in the bank? A. I think your records will show April 17th; April 17th of this year. * * * Q. Now under this April will, so far as this case is concerned, there was a letter in the safe deposit box for your sister Clementine? A. That was inside of this package. Q. I say there was a letter there? A. Yes, sir. Q. And there was one for your brother John? A. That is right. Q. And there was one for the children of your deceased brother Bruno? A. That is right. Q. And there was one for Moritz? A. That is right. Q. And Moritz, according to this, showed a lot of receipted bills and statements? A. That is right," but it does not appear what these "letters" or envelopes contained.

It also appears that the Harford Road property is worth about ten thousand dollars, and that "Paul R. Buchwald, Inc." has little if any value to any one other than Paul R. Buchwald, Jr.

Turning now to the validity of paragraphs 1, 2, 3 and 4 of the will, it is clear enough that they were drawn by one with little knowledge of testamentary law and less of legal phraseology. That, however, is not in itself an objection to their validity, if the language of the will clearly and definitely shows what the testator meant and intended to do and to say. One should not be deprived

of the privilege of disposing of his property by will merely because he is not able to express his will and purpose in legal phraseology, if what he says leaves no doubt in the minds of persons of ordinary experience and intelligence of what he means, and if what he intended violates no rule or principle of established law. The golden rule of testamentary construction is to ascertain, and where it can be done, to give effect to, the testator's intent. All other considerations are subordinate to that and to effect it, punctuation, spelling, construction, the rules of grammar, the literary meaning of words, verbal niceties, may all be disregarded while on the other hand consideration may be given to the effect of common usage on language, and to the testator's mental capacity, education, habits, and environment. So, where a will is drawn by one learned in the law and skilled in the use of its terminology, the words employed will ordinarily be given their accustomed technical meaning, but where it is drawn by a layman the language used may be given the meaning it would commonly have to a person in his situation. *Home for Incurables v. Bruff*, 160 Md. 156, 175, 153 A. 403; *Schlotzhauer v. Kummer*, 149 Md. 583, 587, 132 A. 53; *Hutton v. Safe Deposit & Trust Co.*, 150 Md. 539, 554, 133 A. 308; *Lycett v. Thomas*, 153 Md. 443, 448, 138 A. 225; *Ridgely v. Ridgely, Admr.*, 147 Md. 419, 422, 128 A. 131; *Johns Hopkins University v. Garrett*, 128 Md. 343, 348, 97 A. 640; 69 *C. J.* 52, n. 28; 28 *R. C. L.* 211, n. 3, 219, 221-227; *Miller on Construct. of Wills*, secs. 17-27, inc.

Applying these provisions to clauses 1 and 2 of the will, there is no escape from the conclusion that the testator intended to give to each of the legatees named therein the contents, whatever they might be, of the "letters" respectively addressed to them. He said in respect to each "letter" that it contained the legatee's "share in my estate." The legatee could of course have no share in his estate except as a gift or legacy from him, so, when he spoke of the legatee's "share" in my estate, he could only have meant that by that formula

he intended to give to the legatee what the "letter" contained. His purpose was to make a will, not to convey idle and purposeless information as to the contents of his safety deposit box, and unless he intended by the two clauses mentioned to give to the respective legatees the contents of the "letters" they were meaningless. That they were meaningless to him is wholly inconsistent with his fixed and settled purpose to dispose of his estate by will, and it must be assumed that he meant and intended by those clauses to give to the legatees the articles described in them.

There was, however, in the clauses no description of the specific property contained in the "letters," so that the only way in which the property bequeathed could be identified was its location in a sealed "letter" which was itself definitely identified by an address.

It is obvious that the testator used the word "letter" colloquially, as persons ordinarily refer to an envelope and its contents as a "letter," and that when he spoke of a letter he meant an envelope and its contents. He could have meant nothing else, because the strict etymological meaning of a "letter" would be an epistle, a written message, and while the testator could have addressed an envelope containing such an epistle, it is unreasonable to assume that he meant he had put the address on the letter itself, rather than on the envelope. He used the word letter therefore to identify and describe an envelope used as a receptacle for property which he intended to bequeath to the legatee to whom it was addressed, just as though he had said, "I will give to A. B. the oak chest in my bed room and its contents."

That a valid bequest may be made in that form appears to be recognized in *Creamer v. Harris,* 90 Ohio St. 160, 106 N. E. 967, although in that case, as in others, the scope of the bequest depended upon the intention of the testator to have it include everything found in a given and described location or receptacle, or only articles which might appropriately be associated with such a location. So in *Gaff v. Cornwallis,* 219 Mass. 226, 106

N. E. 860, where a testatrix bequeathed to a cousin "the contents, if any, of a drawer in said safe," which contained certain property, it was held that the property found in the box passed under the bequest. In announcing that conclusion the court said: "It seems clear that by the bequest of the 'contents' of this safe deposit drawer or box the testatrix intended to give to the petitioner the property in question. This place of security was under the sole control of the testatrix. She alone knew what valuable papers she had deposited or intended to deposit therein. Her language, by its plain meaning, embraced whatever securities and property she might have in the box at the time of her death, except such as were otherwise disposed of by the will, or from their nature would not be the subject of a devise or bequest. 1 *Underhill on Wills*, sec. 316; *Richmond v. Vanhook*, 38 N. C. 581. See *Parrott v. Avery*, 159 Mass. 594, 35, N. E. 94. We have not here the uncertainty which sometimes attaches to bequests of personal property that is described only by location. See *Williams, Executors*, 1179; 40 *Cyc.* 1551." And in an annotation to *Creamer v. Harris, supra,* (see Ann. Cas. 1916 C, 1139), it is said: "A bequest of the 'contents' of a house, safe, box, etc., ordinarily operates to pass all the property in the place designated, which is capable of being described as having its locality in that place. *Stuart v. Bute,* 11 Ves. Jr. 657; *In re Craven,* 99 L. T. N. S. 390, 24 Times L. Rep. 75, affirmed 100 L. T. N. S. 284; *In re Oppenheim,* 111 L. T. N. S. 937, 58 S. J. 723; *In re Thompson,* 217 N. Y. 111, 111 N. E. 762; *Richmond v. Vanhook,* 38 N. C. 581. See, also, *In re Frazer,* 92 N. Y. 239; *Johnson v. Johnson,* 48 S. C. 408, 26 S. E. 722."

These two clauses therefore are sufficient to pass to the legatees named in them title to any chose in action, or other tangible personal property, which may be found in the envelopes which they describe and identify. *Gaff v. Cornwallis, supra; Richmond v. Vanhook,* 38 N. C. 581; *Lock v. Noyes,* 9 N. H. 430; *In re Thompson,* 217 N. Y. 111, 111 N. E. 762. They would not, however, be suffi-

cient to pass the title to property granted by some paper contained in the envelope, which is not in itself property, but merely evidence of title to property. *Parrott v. Avery,* 159 Mass. 594, 35 N. E. 94.

So much of the decree as holds inoperative and void Clause 3 must be affirmed, because even if the clause could be accepted as a devise of the land described in the deed, and that we do not decide (*Parrott v. Avery, supra; Ann. Cas.* 1916C, 1140; 28 *R. C. L.* 112; *In re Hull's Estate,* 164 Md. 39, 44, 163 A. 819; 37 *A. L. R.* 1476; *Appeal of Sleeper,* 129 Me. 194, 151 A. 150; 94 *A. L. R.* 253 *et seq.*), it is undisputed that neither the deed nor the certificate of stock described in the clause was in the box at the testator's death, but that both the deed and the certificate of stock had been manually delivered to the legatee by the testator himself. There was therefore nothing within the description of the clause upon which it could operate.

For reasons which need not be repeated, Clause 4 constitutes a valid bequest. It describes with certainty and precision the property bequeathed, and it leaves no reasonable doubt of the intent and purpose of the testator to give that property to the legatee named in the clause.

But while there was error in the ruling as to Clauses 1, 2, and 4, the only persons aggrieved thereby did not appeal, and the persons who did appeal were not aggrieved by it. Paul, who appealed as an individual and as executor, was not aggrieved as an executor (*Wlodarek v. Wlodarek,* 167 Md. 556, 558, 175 A. 455), and as executor had no right to appeal (*Ibid*), and his appeal as executor must be dismissed. He was, however, personally aggrieved by the ruling as to Clause 3 and also by the rulings as to Clauses 5 to 10, inclusive, although he does not complain of them in this court, because if they were held invalid there would be an intestacy as to the property affected by them in which he would have a personal interest. He was not aggrieved by the rulings as to Clauses 1, 2 and 4, since, if invalid, the testator would have died intestate as to the property referred to

in them, which would have been to his advantage, and, since the persons who were aggrieved by the rulings as to them did not appeal, the decree must be affirmed. 5 *C. J. S.* 1423, *Appeal and Error*, sec. 1920.

> *Decree affirmed, and appeal of Paul R. Buchwald, Executor of Paul R. Buchwald, Sr., dismissed; costs to be paid by Paul R. Buchwald.*