# SHRINERS HOSPITALS FOR CRIPPLED CHILDREN
## *v.* MARYLAND NATIONAL BANK, PERSONAL
### REPRESENTATIVE AND TRUSTEE U/W OF
### HARRY CLINTON ET AL.

[No. 94, September Term, 1973.]

*Decided December 7, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, DIGGES and LEVINE, JJ.

*William J. Lehrfeld,* with whom were *John M. Bray, Arent, Fox, Kintner, Plotkin & Kahn, Mahlon W. Hessey* and *Hessey & Hessey* on the brief, for appellant.

*A. MacDonough Plant,* with whom were *William A. Fisher, William R. Dorsey, III,* and *Semmes, Bowen & Semmes* on the brief, for appellee Mary L. Schleupner.

*John B. Powell, Jr.,* with whom were *Wright, Robertson & Dowell* on the brief, for appellee Maryland National Bank.

Submitted on brief by *J. Richard O'Connell* and *Miles & Stockbridge,* for appellees Gladys K. Moore and Helen Crossley.

SINGLEY, J., delivered the opinion of the Court.

This case, on appeal from the Circuit Court No. 2 of Baltimore City (Ross, J.), is concerned with two problems: First, the proper construction of that portion of a testator's will which directed that the income of a residuary trust created by the will be paid to three beneficiaries; and second, the extent to which a court of equity, either in the exercise of its traditional jurisdiction, or in pursuance of a statute, may reform the language of a decedent's will to insure that a remainder interest created by that will can qualify as a charitable deduction for federal estate tax purposes.

The problems surfaced when Harry Edward Clinton, a successful investor, died domiciled in Baltimore on 6 February 1970, leaving an estate of approximately $1,500,000.00, disposed of by a holographic will dated 30 December 1969, which he had apparently drawn himself. The provision with which we are principally concerned is that contained in Item Eight of the will:

"Item Eight: I hereby give, devise, and bequeath the residue of my estate unto the Maryland

National Bank, its successor or successors, Trustee for the uses and purposes set forth:

"My Trustee shall collect the income arising from the principal of the Trust Estate arising from this item Eight (8) and after paying all expenses incident to the trust estate, including the usual commissions to the Trustee, shall distribute the income and principal as follows:

"My Trustee shall pay the *entire net income from this Trust estate in equal shares unto such of Mrs. Gladys K. Moore, Mrs. Helen Crossley, Miss Mary L. Schleupner as shall be qualified to receive the same from time to time.* By 'qualified to receive the same' I mean until their respective deaths as to Mrs. Moore and Mrs. Crossley and to her death or marriage as to Miss Schleupner. This Trust shall terminate when the last person qualified to receive the net income dies or marries, as the case may be, at which time my Trustee shall pay over and deliver the accumulated income and principal as then constituted unto The Shriner's Crippled Children Hospitals to be used by the said hospital to endow a memorial to be known as the Harry Clinton Memorial, the selection and form of the memorial to be in the sole discretion of the then Imperial [Potentate] of the Ancient Arabic Order, Nobles of the Mystic Shrine, [whose] headquarters are in Chicago and the then Potentate of Osiris Temple, Wheeling, West Virginia, of which Temple I have been a member in good standing for over fifty seven (57) years –– this selection shall [embody(?)] all the remainder interest of my estate and *should qualify as a deduction under Section 2055(a)(2) of 1954 Internal Revenue Code or the corresponding Charity section of the Internal Revenue Code in effect at my death."* (Emphasis supplied.)

While Mr. Clinton exhibited not inconsiderable skill as a draftsman, and clearly demonstrated that he had both the

568

charitable intent and tax consciousness frequently associated with people of means, he was apparently unaware that the Tax Reform Act of 1969 [1] was enacted on the very day that he signed his will, and could not know that the Internal Revenue Code of 1954, § 664 and § 2055(e)(2) [hereinafter I.R.C.], would deny a result — which he had very much in mind — the deduction, for federal estate tax purposes, of the value of the charitable remainder unless the trust which he created could qualify as a charitable remainder annuity trust or a charitable remainder unitrust as described by I.R.C. § 664 and the regulations to be issued thereunder.[2] Unhappily, Mr. Clinton's trust was neither, and a federal estate tax saving of some $90,000.00 would be lost unless something could be done.[3]

As a consequence, Maryland National Bank (Maryland National) as personal representative of Mr. Clinton, and as trustee under his will, filed a petition in equity in the Circuit Court No. 2 of Baltimore City seeking a construction of the will and such modification of it as might be necessary to bring its provisions into conformity with the Internal Revenue Code. Joined as respondents were the three income beneficiaries, Gladys K. Moore (born in 1899), Helen Crossley (born in 1896), sisters of Mr. Clinton, and Mary L. Schleupner (born in 1925), together with the holder of the vested remainder, Shriners Hospitals for Crippled Children (the Hospitals). Answers were filed by the several parties, admitting the allegations of the petition and concurring in the granting of the relief prayed.[4]

---

1. Pub. L. No. 91-172, 83 Stat. 487 (1969).

2. A charitable remainder annuity trust is one which specifies a dollar amount, not less than 5% of the initial value of the fund, to be paid, at least annually, to the income beneficiaries, Int. Rev. Code of 1954, § 664(d)(1). A charitable remainder unitrust is one in which the income beneficiaries receive each year a fixed percentage, not less than 5% of the net fair market value of trust assets, computed annually, Int. Rev. Code of 1954, § 664(d)(2).

3. The federal estate tax deduction which Mr. Clinton hoped to realize under I.R.C. § 2055(a)(2), will be disallowed under I.R.C. § 2055(e)(2), unless the trust is made to conform with the requirements of a charitable remainder unitrust as described in I.R.C. § 664. If the trust complies with I.R.C. § 664, the charitable deduction will be permitted by I.R.C. § 2055(e)(2)(A).

4. The United States and the State of Maryland were initially named as parties respondent. The petition was dismissed as to the United States on stipulation, and the State took no active part in the proceeding.

When the case came on for hearing, however, the individuals who were the income beneficiaries, on the one hand, and the Hospitals, as the holder of the vested remainder, on the other, differed in their views as to the proper construction of the will. The individual beneficiaries contended that they, and the survivors of them (subject to the provision in respect to the marriage of Miss Schleupner, which under the will's concept of "qualified to receive the same" will hereafter be treated as equivalent to her death), would take the entire net income, in equal shares, so long as more than one survived, and that the last survivor would take the whole.

The Hospitals took a different view, relying primarily on the provision of the will which directed, on the termination of the trust, that the trustee should "pay over and deliver the *accumulated* income and principal, as then constituted" (emphasis supplied) to the Hospitals, and on Maryland Code (1957, 1972 Repl. Vol.) Art. 50, § 9,[5] which dealt with the express provision required to create a joint tenancy. The Hospitals contended that under a proper construction of the will, upon the death or marriage of Miss Schleupner and upon the death of each of the other life tenants, the share of income to which such person was theretofore respectively entitled should be accumulated and ultimately distributed to the Hospitals when the trust terminated, or should be distributed to them currently if tax considerations required.

### The Proper Construction of the Income Provision

In disposing of the conflicting contentions regarding the devolution of income, Judge Ross said:

"The language of the will so plainly states the intention of the testator that it is not open to

---

**5.** "No deed, devise or other instrument of writing shall be construed to create an estate in joint tenancy, unless in such deed, devise or other instrument of writing it is expressly provided that the property hereby conveyed is to be held in joint tenancy." This section was repealed by Chapter 349, § 1 of the Laws of 1972, effective 1 January 1973, and a substantially similar provision is now codified in Code (1957, 1973 Repl. Vol.) Art. 21, § 5-117.

construction. It is clear he intended that the surviving qualified income beneficiaries would share 'the entire net income' until the termination of the trust upon the death or marriage of the last qualified income beneficiary. '[P]ay the entire net income * * * unto such * * * as shall be qualified * * * from time to time' can have no other meaning. All that [Code (1957, 1972 Repl. Vol.)] Art. 50, § 9 requires is a clear statement of intention and such is present here. *Marshall v. Security Storage Co.*, 155 Md. 649 [, 652-53, 142 A. 186, 187] (1928). The subsequent use of the term 'accumulated income' in connection with distribution upon termination gives rise to no ambiguity. It undoubtedly refers to income accumulated between the last distribution to the final income beneficiary and her death or marriage, thus avoiding the distribution of such income to her estate."

Without intending to question the chancellor's conclusion, we could speculate that Mr. Clinton may well have confused the concept of "accumulated" income with "accrued" income — an imprecision utilized by many draftsmen more sophisticated than he. In general, where a will is drawn by a layman, "the language used may be given the meaning it would commonly have to a person in his situation," *Buchwald v. Buchwald*, 175 Md. 103, 111, 199 A. 795, 798 (1938). Whatever his reason for using "accumulated" as an adjective, it is patent that this does not negate his clear intention as expressed by the will: that the income beneficiaries, and the survivors and survivor of them, were to take the "*entire* net income" until "the last person qualified to receive *the* net income dies or marries." (Emphasis supplied.)

It seems to us that the devolution of the trust income is clearly controlled by the intention of the testator; as expressed in the will, *Davis v. Mercantile-Safe Deposit & Trust Co.*, 235 Md. 266, 269, 201 A. 2d 373, 374 (1964); *Gent v. Kelbaugh*, 179 Md. 343, 350-51, 18 A. 2d 595, 598 (1941);

*Buchwald v. Buchwald, supra,* 175 Md. at 111, 199 A. at 798; *Chew v. Chew,* 1 Md. 163, 168 (1851). We agree with the chancellor, that as expressed in the will, it was Mr. Clinton's intention that such of the income beneficiaries, as were "qualified" from time to time, were to receive the entire net income.

Furthermore, the rule of our cases is clear: income is not to be accumulated absent an express provision or necessary implication, *Green v. Green,* 182 Md. 571, 575, 35 A. 2d 238, 240 (1944); *Burt v. Gill,* 89 Md. 145, 151-52, 42 A. 968, 970, 43 A. 177 (1899); *see also* Restatement of Property § 440 (1944).

Elsewhere, in cases where intention was not clearly spelled out, an equal division among income beneficiaries has been justified as a class gift, *In re Hicks' Estate,* 345 Mich. 448, 75 N.W.2d 819 (1956); *Old Colony Trust Co. v. Treadwell,* 312 Mass. 214, 43 N.E.2d 777 (1942); as a joint tenancy with right of survivorship, *Bodeman v. Cary,* 152 Neb. 506, 41 N.W.2d 797 (1950); *In re Monroe,* 42 R. I. 412, 108 A. 497 (1920); [6] or by an implication of cross remainders, *Kiesling v. White,* 411 Ill. 493, 104 N.E.2d 291 (1952). Examples of the latter in Maryland are *Tilghman v. Frazer,* 191 Md. 132, 59 A. 2d 781, 191 Md. 153, 62 A. 2d 596 (1948), and *Heald v. Heald,* 56 Md. 300 (1881); *cf. Gent v. Kelbaugh, supra. See also* Restatement (Second) of Trusts § 143, comment *b* (1959); 2 Scott, Law of Trusts § 143 (3d ed. 1967). *See generally* Annot., 71 A.L.R.2d 1332 (1960), and Annot., 140 A.L.R. 841 (1942), where cases involving the devolution of income from testamentary trusts upon the deaths of life beneficiaries are collected, and numerous constructions are discussed.

---

**6.** *Compare Monroe* (gift to two beneficiaries, "share and share alike," construed as joint tenancy with right of survivorship, and not as tenancy in common), *with* Rhode Island Hosp. Trust Co. v. Swan Point Cemetery, 62 R. I. 83, 3 A. 2d 236 (1938), *affirmed on reargument,* 63 R. I. 79, 7 A. 2d 205 (1939) (where gift of one-fourth of trust income to each of four beneficiaries from trust provided for payment of remainder to charity upon the death of the last beneficiary, *held,* no right of survivorship existed among co-beneficiaries, and shares of deceased beneficiaries were to be accumulated and added to principal until trust terminated). *See also* Jorgensen v. Pioneer Trust Co., 198 Ore. 579, 258 P. 2d 140 (1953), as an example of a case directing the accumulation of trust income upon the death(s) of multiple life beneficiaries.

### The Modification of the Provisions of the Trust

After the case was at issue, and at or prior to the hearing, Maryland National filed what was later marked for identification as Plaintiff's Exhibit No. 1, titled "The Harry Edward Clinton Charitable Remainder Unitrust under decree by Circuit Court No. 2 of Baltimore City, Maryland," which appears as an appendix to this opinion. It set out in considerable detail the manner in which Maryland National apparently proposed that the will be modified, a modification which was seemingly acceptable to the parties, but not formally consented to by them, except for the provision of Article II relating to distribution of income. Article I made Miss Schleupner's interest a true life estate,[7] and Article II adopted the distribution of income urged by the life tenants and opposed by the Hospitals.

We need not pass on the question whether the proposed modification could have been accomplished solely by agreement of the parties under Chapter 312 of the Laws of 1972 and Chapter 366 of the Laws of 1971, which were enacted by the General Assembly to facilitate the conformance of charitable remainder trusts to certain requirements of the Tax Reform Act of 1969, and are now codified as Code (1957, 1973 Repl. Vol.) Art. 16, §§ 199D-1 and 199F.[8] In the first place, no agreement was reached; and

---

7. Mrs. Moore and Mrs. Crossley were described as having taken a "neutral" position as regards this proposed modification.

8. "§ 199D-1.

Notwithstanding any provisions to the contrary in the governing instrument, the trustee or trustees of any charitable remainder trust created after July 31, 1969 with the consent of each beneficiary named in the governing instrument, may, without application to any court, amend the governing instrument to conform to the provision of § 664 of the Internal Revenue Code of 1954 by executing a written amendment to the trust for the purpose. Consent shall not be required as to individual named beneficiaries not living at the time of amendment. In the case of an individual beneficiary not competent to give consent, the consent of a guardian, appointed by a court of competent jurisdiction, shall be treated as consent of the beneficiary. In the case of any amendment to a trust created by will, the amendment may, if

more importantly, it seems to be conceded that the time for reformation by agreement of the parties expired under Treasury Regulations on 31 December 1972, and that an acceptable modification can now only be effected by judicial decree, Treas. Reg. § 1.664-1(f)(3)(ii) (1972).

Exhibiting commendable restraint, the chancellor filed an opinion in which he declined to rule on the proposed modification of the terms of the will until (i) the question as to the proper construction of the provisions dispositive of income was finally resolved; (ii) the consent of the several parties in interest had been obtained,[9] and (iii) the modifications proposed had been limited to the bare minima required by the Tax Reform Act of 1969. To this end, he retained jurisdiction over the trust estate until a final decree was signed.

We think the chancellor had it just about right when he said:

> "It is clear beyond question that subject to rare exception a court of equity has no power to rewrite or amend a decedent's will. *McCurdy v. Safe Deposit & Trust Company*, 190 Md. 67, 76 [, 57 A. 2d 302, 307 (1948)], and *Ridgely v. Pfingstag*, 188 Md. 209, 228 [, 50 A. 2d 578, 587 (1946)]. Where the overriding general intent of the testator is clear, a court may change, transpose or add to the words of the will in order to effect the general intent.

provided in the amendment be deemed to apply as of the date of death of the testator."

"§ 199F.

The provisions of §§ 199D [concerning trust administration] and 199E [concerning distributions of income] of this article shall not apply to any trust to the extent that a court of competent jurisdiction shall determine that such application would be contrary to the terms of the instrument governing such trust and that the same may not properly be changed to conform to such sections."

9. It would appear that an express consent was not forthcoming prior to the entry of the decree. We were told at argument that there is every likelihood that this can be accomplished, once the contest between the income beneficiaries and the holder of the remainder interest as regards the distribution of income is finally resolved.

*McElroy v. Mercantile-Safe Deposit & Trust Company,* 229 Md. 276 [, 182 A. 2d 775 (1962)]; *Payne v. Payne,* 136 Md. 551 [, 111 A. 81 (1920)]; *Mercantile-Safe Deposit & Trust Company v. Winters, Trustee,* 246 Md. 106 [, 228 A. 2d 289 (1967)]. However, there is a vast difference between the transposition, addition or changing of a word or two in order to carry out the overriding general intent of the testator and incorporating in his will an 8-page document such as is proposed in the instant case.

"One (and perhaps the only one) rare exception to the general rule against amending or rewriting the will of a testator is with respect to charitable trusts under the doctrines of *cy pres* and deviation. IV Scott on Trusts, §§ 381, 399-399.4 [3d ed. 1967]. The contention is made here that the Court should invoke the doctrine of *cy pres* or deviation to prevent the loss of the tax deduction and the consequent diminution in the size of the gift to charity. In a proper case it would seem that an equity court would have the power under either the *cy pres* or deviation doctrine to modify the trust instrument to the extent necessary to insure a charitable deduction for estate or income tax purposes on the theory that diversion of assets from charitable purposes contrary to the clearly expressed intent of the donor would thus be avoided. Art. 16, § 196, Code [(1957, 1973 Repl. Vol.)]; *Miller v. Mercantile-Safe Deposit & Trust Company,* 224 Md. 380 [, 168 A. 2d 184 (1961)]; *Gordon v. City of Baltimore,* 258 Md. 682 [, 267 A. 2d 98 (1970)]; *Wesley Home, Inc. v. Mercantile-Safe Deposit & Trust Company,* 265 Md. 185 [, 289 A. 2d 337 (1972)]; *In the Matter of Estate of Barkey,* [65 Misc. 2d 738,] 318 N.Y.S.2d 843 (Surrogate's Court, New York County 1971); *In re Estate of Klosk,* [65 Misc. 2d 1005,] 319 N.Y.S.2d 685 (Surrogate's Court, New York County 1971); *In re Roche's Will,* [69 Misc. 2d 481,] 330 N.Y.S.2d 441 (Surrogate's Court,

Queens County 1972); *Bok Trust,* [27 Am. Fed. Tax R.2d 71-1331] (Orphans' Court Div., Court of Common Pleas of Montgomery County, Pa. 1971); *Maryland National Bank v. Kidd,* Circuit Court of Baltimore City, Docket 111A, Folio 659, Case No. A-52246.

"A direction or statement of intention in the instrument that the charitable gift qualify for the deduction would weigh in favor of the existence of such a power in a given case. However, the power to alter would extend only to the minimum modification necessary to obtain the deduction and could only exist when its exercise would not disturb any other gift, estate or interest provided for in the trust instrument which the donor had not clearly subordinated to the maximization of the charitable gift. In none of the cases cited and relied on by counsel, or in any found by the Court, was as extensive a rewriting of the trust instrument permitted as is requested here.

"Apparently, the changes needed in this case to conform the will to the requirements of the Tax Reform Act of 1969 are: (1) limit the income to 5% of net market value of the trust assets valued annually, (2) eliminate marriage as an event which would terminate Miss Schleupner's income estate; (3) add express administrative provisions preventing self-dealing by the trustee and prohibiting the trustee from making taxable expenditures, having excess business holdings and investing in a manner jeopardizing the trust's exempt purposes; and (4) provide for distribution of remainder to some other tax qualified charity in the event Shriners is not tax qualified on termination of the trust.

"The *Klosk, Barkey, Roche* and *Bok* cases relied upon by the plaintiff and cited above dealt with charitable trusts in which there were no other beneficiaries. The *Barkey* and *Klosk* cases merely

permitted the addition of administrative provisions. In *Roche* and *Bok* the income of the trust was payable to a charity or charities and the courts permitted only (1) addition of the required administrative provisions and (2) a provision with respect to minimum income distribution. *Estate of Bird* [N.Y.L.J. May 10, 1972] (New York County Surrogate's Court), and *Estate of Pearlbrook*, [30 Am. Fed. Tax R. 2d 72-5904] (New York County Surrogate's Court [1972]) while involving split interest trusts merely provided for inclusion of administrative provisions not inconsistent with any 'mandatory direction' or the 'substance of the testamentary provisions or the rights of the beneficiaries' in the wills. In none of these six cases was the estate or interest of another individual modified by the court nor did it appear from the opinion in any of the cases that any of the modifications or deviations substantially altered an express provision of the trust instrument. It is true that in *Maryland National Bank v. Kidd*, [*supra,*] a nisi prius decision in this court, the estate of a life beneficiary was modified, but such was by express agreement of all affected parties and the court was not called upon to hold that the abandonment of the interest of the income beneficiary resulted in a gift from the grantor rather than the income beneficiary.

"The proposed amendment in this case would:

"1. Modify the income estate of Mary L. Schleupner by eliminating the provision for termination upon her marriage. [Appendix, Article II]

"2. Limit the income to 5% of the net fair market value of the assets of the trust estate valued annually. [Article III]

"3. Require distribution of the remainder interest to another charity which meets the

requirements of Section 170(c) of the Internal Revenue Code to be selected by the trustee in the event that when the remainder falls in Shriners is not an organization which meets such requirements. [Article IV]

"4. Add detailed provisions with respect to determination of income and for its distribution. [Article V]

"5. Add a provision permitting the trustee to apply an income beneficiary's distributable share in its discretion for the comfort and support of the beneficiary in the event of legal disability. [Article VI]

"6. Add a substantial number of express powers for the trustee, many of which are unrelated to the requirements of the Tax Reform Act. [Article VII, and see particularly (b), (g), and (h)]

"7. Modify provisions with respect to payment of trustee's compensation. [Article VIII]

"8. Add a provision requiring annual accounting to each beneficiary. [Article IX]

"9. Modify the provision with respect to the selection of a memorial by empowering the trustee to select it in conjunction with the two Potentates identified in the will rather than leaving it to the 'sole discretion' of the Potentates. [Article X]

"While the proposed amendment might well be one upon which all parties in interest could agree under [Code (1957, 1973 Repl. Vol.)] Art. 16, § 199D-1, it is not one which the Court has the power to adopt under the doctrine of either deviation or *cy pres*. The very most that would be within the Court's power would be to rule that the trust be amended to include (from the items listed above) only items 2, 4 and those powers under item 6 which are required by the Tax Reform Act of 1969. Although the evidence is scant, it seems reasonably clear that the trustee's conclusion expressed in its brief that the income during the existence of the

trust will never exceed that distributable under the proposed formula is a sound one. Furthermore, although the reference to the charitable deduction in the will can more readily be interpreted as an expression of probability or expectancy than a declaration of intent (clearly it cannot serve to incorporate by reference under [Code (1957, 1969 Repl. Vol.)] Art. 93, § 4-107), reading the will as a whole one can support the holding that the testator would prefer the limitation on income to the loss of the charitable deduction.

"Although Internal Revenue has ruled that item 1 is necessary to obtain the charitable deduction, the modification of Miss Schleupner's income estate is so great as to put it beyond the power of the Court, at least without the express consent of all affected parties. It seems ironic that Internal Revenue is insisting on a modification which can only serve to reduce the charitable gift and can in no way increase it. Since Miss Schleupner is substantially younger than the other two income beneficiaries, the chances are she will outlive them by a number of years. If she should marry, the elimination of this event as a disqualifying one would increase her estate and at the same time diminish that of Shriners. Apparently, Internal Revenue's problem is one of difficulty of valuation. Its end could be achieved by requiring valuation of Miss Schleupner's interest as if it were an unrestricted life estate without requiring an actual change in the will. This would assure the minimum deduction and the maximum gift to charity which seems to be more consistent with the underlying policy of the pertinent provisions of the Internal Revenue Code.

"While item 3 is required by Internal Revenue Regulations, it constitutes a change in substance which could only be achieved under [Code (1957, 1973 Repl. Vol.)] Article 16, § 199D-1. There would

appear to be no justification for the remaining suggested modifications. Items 5, 7, 8 and 9 and many of the powers in item 6 appear to bear no relation to the estate tax law or regulations and therefore are unnecessary to prevent diversion of property from charitable purposes. While many of these items might constitute no more than codification of existing rules of law regarding administration of trusts, or innocuous supplements thereto, some materially vary express provisions of the will for no demonstrated tax purpose."

Almost two months thereafter, there having been no express agreement of the parties, a final decree was entered:

"This case came on for hearing in open Court on September 26, 1972. The Court has considered the Petition for Construction of Will and for Amendment, together with the exhibits thereto, the answers filed by the parties respondent, the amendment to the Petition which was made at the hearing, the evidence produced at the hearing of the case, and the memoranda of law submitted by counsel.

"For the reasons stated in a Memorandum Opinion filed on January 11, 1973, the Court has resolved the issues raised in the case as follows:

"(1) That 'The Harry Edward Clinton Charitable Remainder Unitrust under Decree of Circuit Court No. 2 of Baltimore City, Maryland,' marked at trial as Plaintiff's Exhibit No. 1 for Identification, alters the terms of the Will of Harry Edward Clinton to such an extent as to make its adoption beyond the power of this Court, and

"(2) That the clear meaning of the Will of Harry Edward Clinton is that the surviving qualified income beneficiaries would share the entire net income of the trust created under the said Will until the termination of the trust, and

"(3) That in view of the foregoing, Prayer e as

contained in 'Amendment to Petition for Construction of Will and for Amendment of Maryland National Bank, Petitioner' is moot.

"The Court having so resolved the issues, it is this 2 day of March, 1973 by the Circuit Court No. 2 of Baltimore City

"1. ORDERED that Maryland National Bank, Trustee of the trust created under the Will of Harry Edward Clinton, pay the entire net income from the trust in equal shares unto such of the following as are 'qualified to receive the same' as that term is defined as to each of them in the Will — Mrs. Gladys K. Moore, Mrs. Helen Crossley and Miss Mary L. Schleupner — and that said Trustee make no income payments to the remainderman, Shriners Hospitals for Crippled Children, and that only income accumulated between the last distribution to the final income beneficiary and the time she is no longer 'qualified' is to be added to the corpus of the trust for distribution to Shriners Hospitals for Crippled Children.

"2. FURTHER ORDERED that Maryland National Bank, Trustee of the trust created under the Will of Harry Edward Clinton administer said trust pursuant to the terms of said trust and applicable law.

"3. FURTHER ORDERED that this Court retain no jurisdiction over the administration of the trust created under the Will of Harry Edward Clinton."

In their appeal, the Hospitals have challenged not only the construction of the provision relating to the distribution of income, but also the determination that a court of equity is without power to modify the trust instrument without the consent of the several parties in interest.

As regards the power of a court of equity to modify a trust instrument beyond the point of preventing a complete frustration of the creator's purpose, we agree with the chancellor that if an instrument is to be conformed to the

requirements of the Tax Reform Act of 1969, it must be done in the light of the clear expression of legislative intent contained in Code (1957, 1973 Repl. Vol.) Art. 16, § 199D-1. Changes may be made by the parties, for purposes of complying with I.R.C. § 664, so long as the court is satisfied that such alterations are not contrary to the terms of the governing instrument, Code (1957, 1973 Repl. Vol.) Art. 16, § 199F. Reading the two sections together, it would seem that two approaches are available: either amendment by consent of the parties, subject to court review, or amendment by decree of a court of competent jurisdiction with the consent of those parties whose substantive rights may be affected.

The prevailing rule is that the doctrine of reformation of instruments is not applicable to wills,[10] *see* Annot., 90 A.L.R.2d 924, 933-34 (1963), and cases there cited, although concededly a somewhat similar but much more restrictive result may sometimes be accomplished in an action for construction, *see McElroy v. Mercantile-Safe Deposit & Trust Co.*, *supra*, 229 Md. at 283-84, 182 A. 2d at 778-79; *Slingluff v. Johns*, 87 Md. 273, 280-81, 39 A. 872, 875 (1898). Cases dealing with the power of a court of equity to reform other instruments, *e.g.*, *Housing Equity Corp. v. Joyce*, 265 Md. 570, 290 A. 2d 769 (1972); *Anne Arundel County v. Cushman*, 255 Md. 153, 257 A. 2d 150 (1969), are therefore clearly inapposite.

While it is true that trustees cannot alter the interests of the beneficiaries without their consent, *Walbach v. Walbach*, 165 Md. 8, 166 A. 422 (1933), a trust instrument may be reformed by the court to correct a mistake, *Liberty Trust Co. v. Weber*, 200 Md. 491, 507, 90 A. 2d 194, 200, 200 Md. 523, 91 A. 2d 393 (1952); *Kiser v. Lucas*, 170 Md. 486, 496-97, 185 A. 441, 445-46 (1936), in the exercise of an equity court's inherent power. However, the doctrine of reformation is ordinarily applicable only in cases, such as *Liberty Trust* and *Kiser*, involving inter vivos trust

---

**10.** This does not conflict with the doctrine permitting the correction of inconsequential errors appearing in wills, *see, e.g.*, Gage v. Hooper, 165 Md. 527, 533, 169 A. 925, 927 (1934) (correction of fact in attestation clause).

instruments.[11] Here we are confronted with a testamentary trust and, except for the statutes, Code (1957, 1973 Repl. Vol.) Art. 16, § 199D-1 and § 199F, the general prohibition against the reformation of a will would prevail.

Further, it seems to us that this is not a situation where modification can be obtained under the doctrine of *cy pres,* because there is no element of illegality, or impossibility or impracticability of enforcement present here, as contemplated by Code (1957, 1973 Repl. Vol.) Art. 16, § 196; *Gordon v. City of Baltimore, supra,* 258 Md. at 702, 267 A. 2d at 108-09; *Miller v. Mercantile-Safe Deposit & Trust Co., supra,* 224 Md. at 387, 168 A. 2d at 188; *see generally* Casenote, *The Cy Pres Doctrine Explored,* 22 Md. L. Rev. 340, 345-48 (1962); *see also* Restatement (Second) of Trusts § 399, comment *a* (1959); 4 Scott, Law of Trusts § 399, at 3085 (3d ed. 1967); Bogert, Law of Trusts & Trustees § 431, at 390-91 (2d ed. 1964), for a general discussion of common law *cy pres* principles in the absence of statute.

Strictly speaking, neither is this a case where the doctrine of deviation can be invoked, because deviation usually "has to do with the powers and duties of the trustees of charitable trusts with respect to the *administration* of the trust," Restatement (Second) of Trusts § 381, comment *a* (1959) (emphasis supplied); Bogert, *supra,* § 394, at 236. Although deviation is a principle analogous to *cy pres,*[12] and is not as extensive, Restatement (Second) of Trusts § 399, comment *a* (1959), it is a power which may be exercised with particular liberality in the case of charitable trusts, *Gordon v. City of*

---

11. Some cases may warrant the cancellation of inter vivos trusts on the ground of mistake or misunderstanding, *see* Atkinson v. Atkinson, 157 Md. 648, 147 A. 662 (1929) (settlor, aged and infirm, misunderstood meaning of trust deed); Raffel v. Safe Deposit & Trust Co., 100 Md. 141, 59 A. 702 (1905) (inexperienced settlor under mistaken belief regarding her power to revoke trust deed). *Compare* other cases where such relief was denied, *e.g.,* Lambdin v. Dantzebecker, 169 Md. 240, 181 A. 353 (1935); Peter v. Peter, 136 Md. 157, 110 A. 211 (1920) (settlor was an attorney); Kensett v. Safe Deposit & Trust Co., 116 Md. 526, 82 A. 981 (1911); Dayton v. Stewart, 99 Md. 643, 59 A. 281 (1904); Brown v. Mercantile Trust & Deposit Co., 87 Md. 377, 40 A. 256 (1898).

12. *See* Sendak v. Trustees of Purdue Univ., 279 N.E.2d 840, 845 (Ind. App. 1972) (deviation applied and distinguished from *cy pres*); *see also* Thurlow v. Berry, 249 Ala. 597, 605-06, 32 So. 2d 526, 533-34 (1947). *See generally* Bogert, Law of Trusts & Trustees § 394, at 236-42 (2d ed. 1964).

*Baltimore, supra,* 258 Md. at 706, 267 A. 2d at 111; 4 Scott, *supra,* § 381, at 2987.

Even without the statutes, it is conceivable that some degree of modification might have been accomplished, so long as it did not materially alter the substantive rights of the parties, for example, to prevent the frustration of Mr. Clinton's clearly expressed desire that the provision made for the Hospitals should qualify as a charitable deduction for federal estate tax purposes. Here, the root of the difficulty was the absence of the express consents of the affected parties. *See Davison v. Duke University,* 282 N. C. 676, 194 S.E.2d 761 (1973), where modification of the administrative provisions of the trust instrument which created the Duke Endowment to conform to the provisions of the Tax Reform Act of 1969 was permitted, possibly under the doctrine of deviation, only to an extent not at variance with the expressed intention of the settlor.

### Conclusion

While we think that the chancellor was eminently correct in his resolution of both the question of construction and the issue regarding modification, we propose to remand the case so that it may be reconsidered in the event that the necessary consents of the parties are forthcoming. Except for the fact that we were assured at argument that the parties will now be in a position formally to consent to the modifications necessary to conform the provisions of the trust to the requirements of the Tax Reform Act of 1969, we would have affirmed the decree.

> *Case remanded without affirmance or reversal for further proceedings and entry of a decree conformable to the views herein expressed.*
> *Costs to be paid by appellee, Maryland National Bank, from funds of estate in its hands.*

584

## APPENDIX

The Harry Edward Clinton Charitable
Remainder Unitrust Under Decree By
Circuit Court No. 2 of Baltimore
City, Maryland

WHEREAS, in consideration of the agreements made by the trustee of the said Harry Edward Clinton Trust, and by the beneficiaries specified therein and by the personal representative under the will of Harry Edward Clinton deceased, said personal representative shall transfer to said trustee all of the net assets contained within the residue of the estate of said Harry Edward Clinton as the sole and exclusive contribution to such trust and said trustee agrees to hold said assets and all reinvestments thereof, herein collectively known as the "Trust Estate," for the uses and purposes hereinafter set forth.

WHEREAS, in the exercise of its equity powers, the Circuit Court No. 2 of Baltimore City, Maryland, has, on the .......... day of ............ , 1971, amended a certain trust under the will of Harry Edward Clinton to conform to the rules and regulations prescribed by U.S. Internal Revenue Code of 1954, Section 664.

Therefore, be it known that the said Trust Estate, on and after February 6, 1970, be and hereby is subject to the following terms and conditions.

## ARTICLE I

Commencing as of February 6, 1970, and continuing for the lifetime of each of the life income beneficiaries, specified in Schedule A, the "Unitrust Amount of the Trust Estate," (as defined below and as qualified by the last sentence of this Article), shall be paid in equal shares to such beneficiaries quarterly. During the period of administration of the estate of Harry Edward Clinton the requirement to pay such amount may be deferred by the trustee until the end of the taxable year of the Trust in which occurs the earlier of the end of a reasonable period of administration or

settlement of the said estate or the complete funding of the Trust; and the amount which shall then be payable to the life income beneficiaries on such account shall be determined in accordance with Sec. 664 of the Internal Revenue Code and regulations thereunder.

## ARTICLE II

Upon the death of the first to die of the beneficiaries specified in Schedule A, the share of said beneficiary in the Unitrust Amount of the Trust Estate shall be paid equally to the surviving income beneficiaries during their lifetime. Upon the death of the second to die of the beneficiaries specified in Schedule A, the Unitrust Amount of the Trust Estate shall be paid to the surviving life income beneficiary during her lifetime.

## ARTICLE III

The "Unitrust Amount of the Trust Estate" shall be determined annually, and for each taxable year (and pro-rata for each fraction of a year) shall be the lesser of:

"A" five percent (5%) of the net fair market value of the assets of the Trust Estate, valued annually, or

"B" the amount of income from the Trust Estate as determined under Section 643(b) of the Internal Revenue Code and the regulations thereunder, provided, however, that the income so payable shall be the net of the Unitrust amount of the Trust Estate after reduction for all expenses properly charged or chargeable against such income in accordance with laws of Maryland and paragraph (d) of Article VII;

provided further, the "Unitrust Amount of the Trust Estate" shall be increased for any year by the amount of income from the Trust Estate for such year which is in excess of the amount described in "A" above to the extent that, by reason of "B" above, the aggregate of the amounts paid in prior years was less than the aggregate of the amounts which

would have been paid in such prior years if payment had been made in all such years in accordance with "A" above. It is the intention of all persons interested in this Trust Estate that the provisions of this Trust be interpreted and construed to the end that it comply with the requirement of a "Charitable Remainder Unitrust," as set forth in Section 664 of the U.S. Internal Revenue Code of 1954 or any successor to such Section, and the Regulations and Rules which may be prescribed thereunder, and the Trustee is directed to interpret and administer this Trust Agreement in accordance with such intent. Solely for purposes of assuring continuing conformation of the Trust Estate as a qualified "Charitable Remainder Unitrust," the Trustee, with the consent of beneficiaries having an interest in the Trust Estate at the time of any amendment, may amend this indenture to add, delete or otherwise amend provisions of this instrument so as to assure compliance of the Trust Estate with Section 664 of the U.S. Internal Revenue Code and regulations thereunder; provided, however, that no such amendment shall impinge upon the charitable remainder.

## ARTICLE IV

Upon the death of the last to die of the beneficiaries specified in Schedule A, the Trust Estate as then constituted shall forthwith be distributed, free of trust, to SHRINERS HOSPITALS FOR CRIPPLED CHILDREN, 323 North Michigan Avenue, Chicago, Illinois, a Colorado Corporation, for its corporate uses and purposes in the operation of its charitable hospitals absolutely and free from restrictions of any kind whatsoever; provided, however, if such organization is not an organization described in Section 170(c) of the United States Internal Revenue Code at the time the Trust Estate is to be distributed to it, the Trust Estate shall be transferred to such other organization or organizations which are described in and meet the requirements of Section 170(c) of the United States Internal Revenue Code as may be selected by the Trustee.

## ARTICLE V

The valuation date for determining the net fair market value of the assets of the Trust Estate shall be the last day of each taxable year of the Trust. The distribution date for the final quarterly payment in each year of the Trust shall be not later than two and one-half months following the close of the taxable year in respect to which it is made. In the event the net fair market value of the assets of the Trust Estate is incorrectly determined on any annual valuation date, the Trustee shall pay to each recipient, in the case of an undervaluation, or be repaid by each recipient in the case of an overvaluation, an amount equal to the difference between the amount which the Trustee should have paid as the Unitrust Amount of the Trust Estate if the correct value were used and the amount which the Trustee actually paid, such payments to be made within a reasonable period after the final determination of such value.

In the case of a short taxable year which is for a period of less than 12 months other than a taxable year which includes a termination of the amount to be paid to a life beneficiary, the Unitrust Amount shall be such amount multiplied by a fraction the numerator of which is the number of days in the taxable year of the Trust and the denominator of which is 365 (366 if February 29 is a day included in the numerator) and in the event no valuation date occurs before the end of the taxable year of such trust for such short year, the assets of such trust shall be valued on the last day of the taxable year. In the case of the last taxable year of a life income beneficiary during the term of the trust, the Unitrust Amount payable to any life income beneficiary shall terminate with a regular payment next preceding the death of the beneficiary; provided, however, in the event a surviving life income beneficiary is entitled, under Article II, to receive Unitrust Amounts upon the death of a life income beneficiary, the regular payment of the deceased beneficiary shall be divided equally and distributed to the surviving life income beneficiary or beneficiaries.

## ARTICLE VI

If, at any time, a specified income beneficiary or beneficiaries is under a legal disability or by reason of illness or mental or physical disability is, in the opinion of the Trustee, unable to properly manage her or their affairs, the Trustee may pay for the use of said beneficiary her or their shares in the Unitrust Amount of the Trust Estate in such manner as it deems best, for the care, comfort and support of the said beneficiary or beneficiaries.

## ARTICLE VII

The Trustee shall have the following powers and any others that may be granted by law with respect to the Trust created hereunder:

(a) to retain the property described in Schedule B or any other amounts thereto arising through Item Eight of the will of Harry Edward Clinton although not of a character nor constituting a diversification of investments;

(b) to invest and reinvest the Trust Estate in any property, except Mutual Fund Holdings, without being limited by any statute of any state or rule or law concerning investments by trustees; to sell any trust property for cash or on credit at public or private sale; to exchange any trust property for other property; to lease any property; and to determine the prices and terms of sales, leases, exchanges, and options; provided, however, the Trustee is not authorized to invest in any property or transaction, the income realized from which is treated by the Trust Estate as unrelated business taxable income for a taxable year within the meaning of Section 511(a)(1) (as modified by Section 512(b)) and Section 664(c) of the United States Internal Revenue Code.

(c) to employ attorneys, auditors, depositaries, proxies, and agents, with or without discretionary powers; and to keep any property in its own

corporate name, or in the name of its nominee or its agent's nominee, with or without disclosure of any fiduciary relationship, or in bearer form;

(d) to determine in those instances where there is no applicable state law as to a particular income or expense item the manner of ascertainment of principal and income; provided, however, that all capital gains received from any source, stock dividends, stock splits, all distributions received in redemption of stock, all liquidating dividends or distributions in connection with the winding up of the business or liquidation of substantially all of the assets or the dissolution of any corporation shall be allocated to the principal;

(e) to collect, pay, contest, compromise, or abandon any claims either in favor of or against the Trust Estate;

(f) none of the foregoing powers shall be deemed to restrict the Trustee from investing the trust assets in a manner which could result in the annual realization of a reasonable amount of income or gain from the sale or disposition of trust assets;

(g) Notwithstanding any provision to the contrary in this instrument or under any law applicable to the state of Maryland, the Trustee shall not engage in any act of self dealing which is taxable under Section 4941 of the Internal Revenue Code and the Trustee shall not make any taxable expenditures which would subject the Trust to tax under Section 4945 of the Code; the foregoing provisions shall apply to the trustee on and after February 6, 1970.

(h) to pay any amount of the Unitrust Amount of the Trust Estate due any income beneficiary hereunder in cash or in kind.

## ARTICLE VIII

The Trustee agrees to perform the services incident to this

Trust Estate for compensation normally paid trust institutions in the State of Maryland for similar services and in connection with a Trust Estate of comparable size; the Trustee shall be entitled to reimbursement for all reasonable and necessary expenses paid or incurred in connection with the administration of the Trust Estate and pursuant to Article VII, charge such expenses to income or principal, as required by law.

## ARTICLE IX

The Trustee shall render a full and complete accounting at least annually to each beneficiary during the term of the Trust.

## ARTICLE X

The Trustee shall select, in conjunction with the Imperial Potentate of the Ancient Arabic Order of the Nobles of the Mystic Shrine of North America, Chicago, Illinois and the Potentate of Osiris Temple, Wheeling, West Virginia, a proper memorial for the Trust Estate, when rendered to the Shriners Hospitals for Crippled Children, which shall be known as the Harry Edward Clinton Memorial.

## ARTICLE XI

The Trust Estate herein created shall be governed by the law of the State of Maryland. The Trust Estate herein created shall be irrevocable; provided, however, that any amendment to this instrument which assures compliance of the Trust Estate or instrument to the requirements of Section 664 of the Internal Revenue Code, and regulations and rules thereunder, shall not affect the irrevocable nature of the Trust Estate.